UNITED STATES ex rel. BAYARSKY v. BROOKS et al.

No. 8933.

Circuit Court of Appeals, Third Circuit.

Argued Dec. 4, 1945.

Decided March 7, 1946.

George Arthur Fruit, of Washington, D. C. (Rawlings Ragland, Acting Head, Claims Division, of Washington, D. C., Thorn Lord and Edgar H. Rossbach, U. S. Attys., and Rodger M. Yancey and John F. Sonnett, Asst. U. S. Attys., all of Newark, N. J., and Joseph M. Friedman, Chief, War Frauds Civil Section, Department of Justice, of Washington D. C., on the brief), for appellant.

Thomas McNulty, of Jersey City, N. J. (Milton, McNulty & Augelli, and Collins & Corbin, all of Jersey City, N. J., King & Vogt, of Morristown, N. J., David T. Wilentz, of Perth Amboy, N. J., Peter Cohn, of Paterson, N. J., and Charles J. Molloy, of Newark, N. J., on the brief), for appellee.

Before BIGGS, GOODRICH and McLAUGHLIN, Circuit Judges.

BIGGS, Circuit Judge.

The suit at bar is a qui tam action brought under the False Claims Act, R.S. § 3491, 31 U.S.C.A. § 232. It was filed on January 5, 1942 by the relator, David Bayarsky, on his own behalf and on behalf of the United States. The complaint alleges that the defendants in 1935 and 1936 conspired to defraud the United States by submitting collusive bids, by preventing others from bidding or performing their contracts for the sale of sand and stone to the United States for use on WPA projects in New Jersey, and that the defendants presented claims against the United States knowing such claims to be fraudulent and knowingly employed as proof thereof false bills, receipts and vouchers.

In 1938 before the civil suit at bar had been commenced, the persons named as defendants had been indicted under Section 35 of the Criminal Code as amended, 18 U.S.C.A. § 80, for the acts specified in the complaint. In December, 1941, about ten days before the suit at bar was instituted, twenty-five of the forty defendants pleaded guilty to the indictment and were fined

$20,000. On December 23, 1943, the False Claims Act was amended. See 57 Stat. 608, 31 U.S.C.A. § 232. On the date last mentioned the instant suit had reached the stage of pleading where some defendants had filed answers to the complaint and an order had been made to require the relator to furnish a bill of particulars to one defendant. On January 11, 1944 the court below, pursuant to clause (D) of the amending act, entered an order staying all proceedings and notified the Attorney General of the pendency of the suit. The United States entered an appearance within the sixty days prescribed by clause (D). On March 28, 1944 the relator moved to strike the entry of the appearance for the United States contending that the Act of December 23, 1943 was unconstitutional. The court below reserved decision on this question. On September 20, 1944 some of the defendants moved to dismiss the suit on the ground that it was based upon information in the possession of the United States on January 5, 1942 when the suit was filed and that the provisions of clause (C) of the amending act deprived the court below of jurisdiction of the suit. An affidavit was filed in support of the motion. This affidavit points out that the complaint, mutatis mutandis, is a Chinese copy of the indictment. On January 17, 1945 the court below granted the motion to dismiss. See United States v. Brooks, D.C., 58 F.Supp. 714. Thereafter those defendants who had not joined in the motion filed similar motions to dismiss. On March 6, 1945 the court below entered an order abating the action as to all defendants. The United States has appealed.

The question presented is one of statutory interpretation. The learned District Judge concluded, basing his decision upon the language of clause (C) of the amending statute [1] that it was the manifest purpose of Congress in amending the statute to bring an end to the practice of filing suits by persons who had no information of their own in respect to frauds on the United States but prepared their complaints from information obtained from indictments returned from federal grand juries, from congressional investigations or from newspaper stories. He interpreted the phrase of clause (C), "any such suit", to require abatement of the suit at bar because its complaint was based on information obtained from an indictment. In other words, the court below took the position, despite the provisions of the act which permit intervention by the United States and those of clause (E) (2) that the amount of the recovery to the informer shall be limited to an amount "which in the judgment of the court is fair and reasonable compensation to such person for the collection of any forfeiture and damages", that the instant suit could not be maintained.

The phrase "any such suit" appearing first in clause (C) does not require the abatement of the suit at bar. It will be observed that where first used it is followed by the phrase "brought by any person under clause (B)." Since the United States has entered an appearance in the cause within the prescribed time the suit is not one within the purview of clause (B). The construction put upon the statute by the court below therefore is not a permissible one. Legislative history aids greatly in interpretation. The history of the False Claims Act demonstrates that it was intended to correct substantial abuses which Congress had clearly in mind. The original law was enacted March 2, 1863, 12 Stat. 696, the Civil War having given opportunity to the unscrupulous to defraud the United States. The Attorney General of the United States and his subordinates did not possess the facilities necessary to investigate adequately or to prosecute frauds against the United States.[2] Senator Howard, who was in charge of the bill, stated that it was based "* * * upon the old-fashioned idea of holding out a temptation, and 'setting a rogue to catch a

---

[1] As follows: "The court shall have no jurisdiction to proceed with any such suit brought under clause (B) or pending suit brought under section 3491 of the Revised Statutes whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought: Provided, however, That no abatement shall be had as to a suit pending at the effective date of this Act if before such suit was filed such person had in his possession and voluntarily disclosed to the Attorney General substantial evidence and information which was not theretofore in the possession of the Department of Justice."

[2] See Cong.Globe, 37th Cong., 3rd Sess., (1863) p. 952.

rogue', which is the safest and most expeditious way I have ever discovered of bringing rogues to justice." [3] The intent of Congress could scarcely be stated more clearly.

But the statute as it existed prior to the amendments of 1943 resulted in races to the courthouses by informers anxious to secure shares of possible recoveries. The filing of numerous qui tam actions threatened effective law enforcement and hampered the administration of justice. Congress met this situation by the 1943 amendments to the Act and, inter alia, created controls which applied to then pending qui tam suits. These controls were placed in the United States. But Congress provided also that if the United States should fail or should decline to enter any suit or should neglect to carry on a suit with "due diligence" for a specified period, the control of the suit reverts to the relator. All of this seems clear from the words of the amending act.

The legislative history of the 1943 statute shows with equal clarity that it was the intention of Congress to make the United States the master of pending qui tam suits. Following the decision of the Supreme Court in United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443, the change in the law was initiated in the House of Representatives in H.R. 1203. This bill was passed by the House on April 1, 1943 with little debate. [4] As passed it repealed the informer and limitations clauses of the False Claims Act, viz., that portion of R.S. § 3491 permitting informers to bring suit and also all of R.S. §§ 3493 and 3494, 31 U.S.C.A. §§ 234, 235, thereby eliminating informer suits though leaving within the purview of the statute suits brought by the United States on its own behalf. When the bill came into the Senate opposition was encountered to such a solution and amendments followed.

In its report the Senate Committee made clear its intention that informer suits should not be eliminated but rather that such suits should be put in charge of the United States when considered desirable by the Attorney General. Senator Van Nuys, who was in charge of the bill in the Senate, quoted from a letter by the Attorney General. That Officer stated [5] that under existing conditions the United States was compelled to file civil actions at the same time that indictments were returned in order to put a stop to the unseemly race of informers to the courthouse and that this should be avoided and the United States be given a sufficient length of time to consider the course which it should pursue. After conference the law was passed by Congress in its present form. [6] It is notable that the bill in the House was entitled "A Bill *to eliminate* private suits for penalties and damages arising out of frauds against the United States". The title of the act is "An Act *to limit* private suits for penalties and damages arising out of frauds against the United States." [7]

---

[3] See Cong.Globe, 37th Cong., 3rd Sess., (1863) p. 956.

[4] See 89 Cong.Rec. 2800–2801 (1943).

[5] See Senate Rep.No.291, 78 Cong. 1st Sess., 1943, as follows:

"Section 3491, Revised Statutes, was enacted during the Civil War time, to meet a situation then existing, which does not now exist. At that time the office of the Attorney General was not staffed sufficiently to handle the many matters which arose and was not possessed of investigative facilities now at the disposal of that office. Now adequate facilities in respect to handling such matters exist and through the Federal Bureau of Investigation and many other investigative agencies of the Government, adequate investigations of frauds against the United States are being made. The experience of the Department in the present war has established that many persons who have filed suits and may file suits under this section, have no information or facts of their own, but prepare and file complaints which obviously are based on information and alleged facts obtained bodily from indictments returned in United States courts, from newspaper stories, and congressional investigations. * * * The Department's principal desire for the enactment of this bill is that the United States be protected against being compelled to disclose its facts involved in any criminal prosecution it may have undertaken or is about to undertake. Their experience has shown that upon filing of such civil suits, steps are soon taken to compel discovery, by taking deposition and otherwise, in the civil suits, to ascertain the facts upon which the Government is proceeding. All such matters tend to embarrass the Government in its conduct of criminal prosecutions in obtaining what they otherwise would not be entitled to obtain and could not secure."

[6] See 89 Cong.Rec. 10,687–10,688, 10,-752, 10,844–10,845, 10,849 (1943).

[7] Emphasis added in both titles.

It is perhaps unnecessary to labor the subject further. But we think we should state that if it had been the intention of Congress by the 1943 act to eliminate pending qui tam actions the extensive control provisions of the statute are unnecessary and the framers of the law could have embodied their views in a few words contained in a single paragraph. If the contentions of the appellees as to legislative intent are correct the provisions of clause (E) are totally unnecessary as indeed are the major portions of clauses (C) and (D). Cf. Sherr v. Anaconda Wire & Cable Co., D.C.S.D.N.Y., 57 F.Supp. 106, 108, affirmed on the ground that it was not a violation of the Fifth Amendment to deprive an informer of the control and possibly of all of the proceeds of the recovery, in 2 Cir., 149 F.2d 680.

Conclusions similar to those expressed herein were arrived at by the Circuit Court of Appeals for the Fifth Circuit in United States v. Pittman, 151 F.2d 851. We think that the position taken by that court is correct. Cf. United States ex rel. Rodriguez v. Weekly Publications, Inc., 2 Cir., 144 F.2d 186, 187, quoted in the opinion of the court below.

The order of the court below abating the suit is reversed.