

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-29-2000

# USA Ex Rel Merena v. Smithkline Beecham

Precedential or Non-Precedential:

Docket 98-1497

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"USA Ex Rel Merena v. Smithkline Beecham" (2000). *2000 Decisions.* Paper 39.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/39

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 29, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-1497

UNITED STATES OF AMERICA EX REL.
ROBERT J. MERENA

v.

SMITHKLINE BEECHAM CORPORATION

United States of America,
Appellant

No. 98-1498

UNITED STATES OF AMERICA EX REL.
KEVIN J. SPEAR; THE BERKELEY COMMUNITY LAW
CENTER; JACK DOWDEN

v.

SMITHKLINE BEECHAM CLINICAL LABORATORIES, INC.

United States of America,
Appellant

No. 98-1499

UNITED STATES OF AMERICA EX REL.
GLENN GROSSENBACHER; CHARLES W. ROBINSON, JR.

v.

SMITHKLINE BEECHAM CLINICAL LABORATORIES, INC.

United States of America,
Appellant

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(Dist. Ct. Nos. 93--cv--5974 and 95-cv-6551)
District Judge: The Honorable Donald W. VanArtsdalen

Argued: March 5, 1999

Before: ALITO, McKEE, AND GARWOOD,* Circuit Judges

(Opinion Filed: February 29, 2000)

        Douglas N. Letter
        Freddi Lipstein (argued)
        United States Department of Justice
        Civil Division, Appellate Staff
        601 D. Street, N.W.
        Washington, D.C. 20530-0001
         Attorneys for Appellant
        United States of America

        Marc S. Raspanti (argued)
        Miller, Alfano & Raspanti
        1818 Market Street
        Suite 3402
        Philadelphia, PA 19103
         Attorney for Appellee
        Robert J. Merena

_____

* The Honorable Will L. Garwood, Senior Circuit Judge for the United States Court of Appeals for the Fifth Circuit, sitting by designation.

Thomas H. Lee, II
Dechert, Price & Rhoads
1717 Arch Street
4000 Bell Atlantic Tower
Philadelphia, PA 19103
 Attorney for Appellee
Smithkline Beecham

Normand F. Pizza
Nyda S. Brook
Christopher J. Shenfield
Brook, Pizza, & Van Loon
400 Poydras Street
Suite 2500
New Orleans, LA 70130
 Attorneys for Appellee
William, St. John & LaCorte

John E. Clark
Goode, Casseb & Jones
700 North St. Mary's Street
Suite 1700
San Antonio TX 78205
 Attorney for Appellees
Charles W. Robinson, Jr., and
Glenn Grossenbacher

Peter W. Chatfield
Phillips & Cohen
2000 Massachusetts Avenue, N.W.
Washington, DC 20036
 Attorney for Appellees
Kevin J. Spear, Berkeley
Community Law Center, and
Jack Dowden

Carol S. Dew
Dew & Smith
100 Court Street
P.O. Box 30
Monroe, GA 30655-0030
 Attorney for Appellee
Jeffrey Clausen

3

Lisa R. Hovelson
Taxpayers Against Fraud
Suite 501, 1220 Nineteenth Street,
 N.W.
Washington D.C. 20036
 Attorney for Amicus Curiae
Taxpayers Against Fraud, The
False Claims Act Legal Center

Daniel Popeo
Paul D. Kamenar
Washington Legal Foundation
2009 Massachusetts Avenue, N.W.
Washington, D.C. 20036
 Attorneys for Amicus Curiae
Washington Legal Foundation

OPINION OF THE COURT

ALITO, Circuit Judge:

In this appeal, the United States challenges the District Court's decision to award a group of qui tam relators approximately $52 million of the government's settlement with defendant SmithKline Beecham Clinical Laboratories of a variety of claims under the False Claims Act, 31 U.S.C. S 3729 et seq. For the reasons explained below, we reverse and remand for further proceedings.

I.

A. In 1992, the United States began to suspect tha t SmithKline Beecham Clinical Laboratories ("SKB") and several other medical laboratories had adopted a scheme that allowed them to bill the federal government for unauthorized and unnecessary laboratory tests. Specifically, the government suspected that the laboratories had "bundled" a standard grouping of blood tests with some additional tests and had then marketed this grouping to doctors by leading them to believe that the additional tests would not increase costs to Medicare and other government-sponsored health programs.

4

After the tests were ordered, the laboratories "unbundled" the additional tests from the standard grouping for purposes of billing. In many instances, treating physicians had made no determination that the additional tests were medically necessary for the diagnosis or treatment of patients; instead, the physicians had ordered the tests solely because they were sold as a package with other tests that they had deemed necessary. As a result, the laboratories submitted bills--and received payment-- for tests that were medically unnecessary.

This scheme, which later became known as the "automated chemistry" scheme, attracted national attention in December 1992 when one of the contractors that had engaged in the practice, National Health Laboratories, settled a lawsuit brought under the False Claims Act for $111 million. See Joint App. at 1432-1441. Public interest grew as the news media reported that the government had issued comprehensive subpoenas to SKB and other laboratories. See Joint App. at 1442-1450, 1451-1457, 1470-1473.

B. In November 1993, relator Robert Merena, an SKB employee, filed a qui tam action against SKB in the United States District Court for the Eastern District of Pennsylvania. His complaint contained eight separate claims under the False Claims Act. Merena's complaint alleged that SKB had defrauded the government by, inter alia, billing for tests that were not performed, double billing, paying illegal kickbacks to health care professionals, and adding tests to "automated chemistry" profiles and then separately billing for those tests. App. at 75-103.

One month later, relator Glenn Grossenbacher, an attorney, filed a second qui tam action against SKB in the United States District Court for the Western District of Texas.[1] Relators Kevin Spear, Jack Dowden, and the Berkeley Community Law Center (collectively, "the Spear relators") followed in February of 1995 with a suit in the Northern District of California. The courts in Texas and California

---

1. In August 1995, Dr. Charles Robinson, a former SKB medical director in San Antonio, joined the Grossenbacher complaint.

transferred these actions to the Eastern District of Pennsylvania for consolidation with the Merena case.

After Merena's action was filed, the government commenced an investigation into a series of new claims that were not part of its original investigation. At the same time, the government continued to pursue the original "automated chemistry" investigation that it had begun after the 1992 settlement with National Health Laboratories.

C. In August 1995, the government began formal settlement negotiations with SKB. The government presented SKB with a written settlement framework that allocated a specific dollar amount for each alleged false claim. Joint App. at 1476-1491.

By early 1996, SKB and the government had reached a tentative agreement to settle, for $295 million, certain federal and state claims for losses occurring through December 31, 1994. This agreement was intended to settle claims related to the government's original "automated chemistry" investigation, along with additional claims in the qui tam actions filed by relators Merena, Grossenbacher, and Spear. At a meeting on March 22, 1996, counsel for the United States explained to the relators the components of the proposed settlement. See Joint App. at 1537, 1538-1549. During the summer of 1996, the United States negotiated an additional payment from SKB of $30 million to resolve additional claims that arose during 1995 and 1996. Joint App. at 859, 1223.

The government formally intervened in the Merena, Grossenbacher, and Spear actions pursuant to 31 U.S.C. S 3730(b)(2). Soon thereafter, the District Court formally approved a settlement agreement between the United States and SKB for $325 million plus interest. See Joint App. at 201-221. Although the False Claims Act provides a specific mechanism for relators to challenge the adequacy of a settlement agreement into which the government enters, 31 U.S.C. S 3730(c)(2)(B), Merena, Grossenbacher, and the Spear relators did not challenge the overall statement. See Joint App. at 213.

After approving the settlement agreement, the District Court dismissed the three qui tam actions with prejudice.

However, the Court expressly retained jurisdiction over, among other things, the "determination of the relators' qui tam shares." Dist. Ct. Op. At 7. See Joint App. at 198, 274–277.

The District Court subsequently disposed of complaints that three other relators filed after the Merena, Grossenbacher, and Spear complaints. The Court analyzed these complaints on a claim–by–claim basis in order to determine whether each claim was barred under the"first-to-file" rule imposed by 31 U.S.C. S 3730(b)(5). The Court was able to identify only one claim that had not been raised in one of the previously filed complaints. Accordingly, the Court allowed that claim to survive but barred all the others. The later-filing relators appealed, but we affirmed the District Court's decision. See United States ex rel. LaCorte v. SmithKline Beecham Clinical Lab., 149 F.3d 227, 325–36 (3d Cir. 1998).

The government failed to reach an agreement with relators Merena and Grossenbacher on the amount that they would receive from the settlement agreement. The government maintained that Merena was entitled to approximately $10 million of the $65 million attributable to the non–"automated chemistry" claims and has paid Merena this amount. The government and the Spear relators have a proposed agreement that, if approved, will award the Spear relators 15% of the $13 million that the government attributed to a claim called the "CBC Indices" claim.

D. The core of the current dispute between the Uni ted States and relators Merena, Grossenbacher, and Robinson (hereinafter "the relators") concerns the relators' right to a share of the settlement proceeds attributable to the "automated chemistry" claims. The relators argue that they are entitled under 31 U.S.C. S 3170(d) to a percentage of the total proceeds that the government obtained in the settlement. The government, on the other hand, maintains that the relators may not receive any portion of the proceeds attributable to the "automated chemistry" claims because the relators' "automated chemistry" claims were jurisdictionally barred under the public-disclosure provision of the qui tam statute, 31 U.S.C. S 3730(e)(4) ("section

7

(e)(4)"), which provides that "[n]o court shall have jurisdiction" over any False Claims Act action that is "based upon" certain specified public disclosures unless the action is brought by the Attorney General or an "original source" of the information. The government contends that the District Court lacked subject matter jurisdiction over the relators' "automated chemistry" claims and, accordingly, could not grant them any share of the settlement allocable to those claims.

The District Court held an evidentiary hearing regarding this dispute. The government presented evidence concerning the portion of the total settlement that was attributable to each claim.[2] The government also presented evidence showing that the "automated chemistry" claims had been under investigation, and were widely reported in the news media, long before any of the qui tam complaints were filed. Joint App. at 2159-2160, 2204.

In an unpublished opinion, the District Court accepted the relators' position. The Court denied the government's motion to dismiss the relators' "automated chemistry" claims under 31 U.S.C. S 3730(e)(4), noting that the qui tam complaints had already been dismissed with prejudice and "[did] not have to be re-dismissed." Dist. Ct. Op. At 36. Agreeing with the relators that the question of subject matter jurisdiction was "mooted" when the government formally intervened in the action, the Court declined to decide whether the relators' "automated chemistry" claims would have been subject to dismissal prior to the government's intervention. Id. at 36-37.

The Court also rejected the government's argument that it was necessary to analyze the relators' complaints on a claim-by-claim basis in order to calculate their shares. Id. at 37-43. The Court observed:

> The qui tam statute involved makes no mention of treating a qui tam complaint as having distinct and divisible claims for the purpose of determining the qui tam Relator's share of the proceeds. The statute

_____

2. The government also presented evidence that the relators had actively participated in the allocation process. See Joint App. at 1476-1491.

> provides that where the Government intervenes and
> proceeds with the action, as it did in these cases, the
> qui tam Relator shall "receive at least 15 percent but
> no more than 25 percent of the proceeds of the action
> or settlement of the claim." (Underlining added). The
> statute speaks of the action and claim as a single unit
> or whole entity.

Dist. Ct. Op. at 38. In addition, the Court noted that the
government had "never sought to have any of the relators'
qui tam allegations dismissed prior to the entry of the order
settling and dismissing each of the actions with prejudice,"
that the government had never sought leave to file an
amended complaint, and that the Settlement Agreement
and related filings did not break down the settlement on a
claim-by-claim basis. Id. at 38–39. Furthermore, the Court
stated that "[t]here [was] absolutely no evidence on the
record . . . to establish any allocation." Id . at 41. See also
id. at 42 ("Even if dividing the proceeds among separate
claims would be appropriate, there is no evidence upon
which a fact-finder could rationally make such a
determination on the record before me.") The Court
concluded that the relators were entitled under 31 U.S.C.
S 3170(d) to between 15% and 25% of approximately $306
million.3 After considering the contributions made by the
relators, the Court decided that they should jointly receive4
an award of 17% of the proceeds -- or more than $52
million. Since the government had already paid Merena
about $10 million, the Court entered an order awarding the
relators approximately $42 million. The United States
appealed.

_____

3. This sum was calculated as follows: the settlement proceeds plus
interest (about $334 million) minus both the total paid to state Medicaid
Fraud units (about $14.5 million) and the agreed allocation to the Spear
relators (about $13 million).

4. The Court found it unnecessary to decide whether either the Merena
or Grossenbacher complaint was barred under thefirst-to-file rule of
S 3730(b)(5) because these relators had "agreed among themselves as to
the division of any proceeds, regardless to whom the award or awards
were made." Dist. Ct. Op. at 69.

9

II.

This appeal requires us to decide two chief legal issues. The first concerns the application of the relevant provisions of the qui tam statute to a multi-count complaint. The second concerns the interpretation of section 3170(e)(4) and its relationship to the provision governing awards to relators in cases in which the United States elects to proceed with the action, 31 U.S.C. S 3170(d). We will discuss each of these issues and then apply our conclusions to the particular situation presented in this case.

A. As we have previously commented, the draftsmans hip of the qui tam statute has its quirks, see United States ex rel. Mistick v. Housing Authority of the City of Pittsburgh, 186 F.3d 376, 387 (3d Cir. 1999), and one of those quirks is that the statute is based on the model of a single-claim complaint. See id. The District Court in this case stated: "It would seem almost inevitable to me that at least in most qui tam actions there would be allegations of multiple false claims alleged in a complaint," Dist. Ct. Op. At 38, and we are inclined to agree, but the qui tam statute is phrased as if every qui tam complaint contained only one claim. The following provisions illustrate this pattern.

The statute authorizes a qui tam plaintiff to bring a "civil action for a violation of section 3729," 31 U.S.C. S 3730 (b)(1)(emphasis added), but surely such a plaintiff may bring an action containing multiple claims, each of which alleges a separate violation of section 3729. When a qui tam action is filed, the government may "proceed with the action," SS 3730(b)(2) and (4)(emphasis added) or "decline to take over the action," S 3730(b)(4)(B)(emphasis added), but the government often decides to take over only certain claims in a multi-claim action, and we are aware of no decision holding that this is improper. The statute authorizes the government to "dismiss the action" and "settle the action," 31 U.S.C. S 3730(c)(2)(A) and (B), but again, we are aware of no decision holding that the government may not settle or dismiss only some of the claims in a multi-claim complaint, and we can think of no reason why the government should not be permitted to do so.

10

Under the "first-to-file" rule of section 3730(b)(5), when a relator "brings an action," "no other person may . . . bring a related action based on the facts underlying the pending action." But as the District Court's prior rulings in this case illustrate, when it is asserted that a later-filed complaint contains claims that are based on the facts underlying certain claims in a pending multi-count complaint, the court must conduct a claim-by-claim analysis in order to determine if section 3730(b)(5) applies.

Section 3730(e), provides that no court shall have jurisdiction over "an action" that falls into one of four categories: (1) "an action" brought by a former or present member of the armed forces against a member of the armed forces arising out the plaintiff 's military service, (2) "an action" against a member of Congress or the judiciary or a senior executive branch official if "the action" is based on evidence or information known to the Government, (3)"an action" based upon allegations or transactions that are the subject of a civil suit or certain administrative proceedings to which the government is a party, and (4) "an action" based on certain publicly disclosed information (unless the action is brought by the Attorney General or an original source). What happens under these provisions if a relator files a multi-claim suit and some, but not all, of the claims fall into one of these categories? The plaintiff 's decision to join all of his or her claims in a single lawsuit should not rescue claims that would have been doomed by section (e)(4) if they had been asserted in a separate action. And likewise, this joinder should not result in the dismissal of claims that would have otherwise survived.

Thus, in applying section (e)(4), it seems clear that each claim in a multi-claim complaint must be treated as if it stood alone. It follows, therefore, that in determining whether the relators in this case are entitled to a share of any proceeds that are attributable to the "automated chemistry" claims, we must consider whether they would have been entitled to such a share had their complaints asserted those claims alone. We now turn to that question.

B. The government contends that the relators are n ot entitled to any share of the proceeds attributable to the "automated chemistry" claims because those claims are

based upon publicly disclosed information and fall within the jurisdictional bar of S 3170(e)(4). The government reasons as follows: the District Court lacked subject matter jurisdiction over the relators' automated chemistry claims;5 therefore, the Court could not award them any recovery.

Perhaps because the government couches its argument in terms of subject matter jurisdiction, the District Court and the relators respond in similar terms. Both argue that any jurisdictional problem that might have existed with respect to the "automated chemistry" claims when the relators' complaints were originally filed was cured when the government elected to proceed with those claims. They note -- and the government does not disagree -- that the District Court had subject matter jurisdiction over the "automated chemistry" claims, as well as the other claims, once the government intervened. And the relators also rely on an old series of cases in our circuit,6 which they interpret to mean that even if a relator's claim is originally subject to a jurisdictional bar, intervention by the government cures the jurisdictional defect. The government replies by attempting to draw a distinction between jurisdiction over the automated chemistry claims as prosecuted by the United States on its own behalf after intervention (which the government agrees the District Court had) and jurisdiction over those same claims as they concerned the relators after intervention (which the government strenuously contends the District Court lacked). According to the government, the District Court's lack of the second type of jurisdiction mandated the dismissal of the relators as parties with respect to the automated chemistry claims.

_____

5. Although Section 3730(e)(4) is framed in jurisdictional terms, the Seventh Circuit has suggested that it does not really concern subject matter jurisdiction. See United States ex rel. Fallon v. Accudyne Corp., 97 F.3d 937, 941 (7th Cir. 1996). For the reasons explained in the text, we find it unnecessary to resolve this question.

6. In chronological order they are: United States ex rel. Bayarsky v. Brooks, 58 F. Supp. 714 (D.N.J. 1945); United States ex rel. Bayarsky v. Brooks, 154 F.2d 344 (3d Cir. 1946); United States ex rel. Bayarsky v. Brooks, 110 F. Supp. 175 (D.N.J. 1953); United States ex rel. Bayarsky v. Brooks, 210 F.2d 257 (3d Cir. 1954).

12

We do not agree with the parties that the relators' right to a share of the automated chemistry proceeds turns on a question of subject matter jurisdiction.7  Suppose that the government is right that the District Court should have dismissed the relators as parties with respect to the automated chemistry claims. It would not necessarily follow that the relators could not be awarded a share of the automated chemistry proceeds. Congress may enact a statute providing for the payment of a reward or bounty to a non-party who assists the government's enforcement efforts. See, e.g., 15 U.S.C. S 78u-1. Similarly, suppose that the relators are right that the government's intervention cured any prior jurisdictional defect and that the District Court properly refused to dismiss the relators as parties with respect to the automated chemistry claims. It would not necessarily follow that the relators are entitled to a share of the proceeds. Clearly, Congress need not provide for such relators to obtain a portion of the proceeds just because they remain parties.

The relevant question is not one of jurisdiction but simply whether the qui tam statute authorizes an award when a relator asserts a claim that is subject to dismissal under S 3170(e)(4) but the government intervenes before the claim is dismissed. In order to analyze this question it is necessary to examine both section 3730(e)(4) and section 3730(d).

Section 3730(e)(4) provides as follows:

> (A) No court shall have jurisdiction over an actio n under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

_____

7. Although Section 3730(e)(4) is framed in jurisdictional terms, the Seventh Circuit has suggested that it does not really concern subject matter.

(B) For purposes of this paragraph, "original s ource" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

Thus, if a relator who is not an "original source" asserts a claim based upon one of the types of public disclosure specified in this provision8 and the government does not intervene, the claim must be dismissed, and the relator obviously receives no award. This provision does not expressly address the question whether such a relator is entitled to an award if the government intervenes before the relator's claim is dismissed -- although it certainly counsels in favor of skepticism about a relator's ability to get an award under those circumstances.

Other sections of the qui tam statute deal directly with awards to relators. Under section 3730(d)(2), if the government does not intervene, a relator is entitled to 25-30% of the proceeds. But if the government intervenes (and thus takes on the primary burden of prosecuting the action), the share to which the relator is entitled is reduced as specified in section 3730(d)(1). This provision states in pertinent part:

If the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action. Where the action is one which the court finds to be based primarily on disclosures of specific information (other than information provided by the person bringing the action) relating to allegations or

_____

8. In United States ex rel. Mistick v. Housing Authority of the City of Pittsburgh, 186 F.3d at 385-89, we held that a claim is "based upon" a public disclosure if it is based upon information contained in such a disclosure, whether or not the relator actually relied upon that disclosure.

14

transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, the court may award such sums as it considers appropriate, but in no case more than 10 percent of the proceeds, taking into account the significance of the information and the role of the person bringing the action in advancing the case to litigation. Any payment to a person under thefirst or second sentence of this paragraph shall be made from the proceeds.

The parties in this appeal differ sharply regarding the types of cases that fall within the various recovery ranges. The government, as previously noted, takes the position that a relator who asserts a claim that is subject to dismissal under section 3730(e)(4) is not entitled to any award even if the government intervenes. Thus, the government's view is that section 3730(d)(1) has no application in such a case. If the government's view is accepted, we believe that the permissible ranges of recovery for various types of cases is captured by the following table:

15

TABLE A

Relator's Share Types of Cases

| Relator's Share | Types of Cases |
|---|---|
| 15-25% | 1. relator brings an action tha t is not "based upon" publicly disclosed information<br>2. "original source" brings an action that is "based upon" but not "primarily based" on publicly disclosed information<br>3. "original source" brings an action that is "primarily based" on publicly disclosed information, but the "original source" provided the information |
| ó 10% | "original source" brin gs an action that is "primarily based" on publicly disclosed information, and "original source" did not provide that information |
| 0% | relator brings an action that is subject to dismissal under S 3730(e)(4) |

The relators read sections 3730(e)(4) and 3730(d) quite differently. As already mentioned, they contend that section 3730(e)(4) does not preclude an award where a relator asserts a claim that is subject to dismissal under that section but the government intervenes before the claim is dismissed. The award in such a case consequently would be governed by Section 3730(d). If the relators' position is accepted, we believe that the permissible recovery ranges for the various types of cases would be as follows:

16

TABLE B

Relator's Share Types of Cases

| Relator's Share | Types of Cases |
|---|---|
| 15-25% | 1. relator brings an action that is not "based upon" publicly disclosed information |
| | 2. relator brings an action that is "based upon" but not "primarily based" upon publicly disclosed information |
| | 3. relator brings an action that is "primarily based" upon publicly disclosed information but relator provided the information |
| ò 10% | relator brings an action that is "primarily based" upon publicly disclosed information, and the relator did not provide the information |

We find the government's position much more persuasive. Under this view, sections 3730(e)(4) and 3730(d)(1) provide a descending scale of recovery ranges that are proportional to the public service provided by the relators. The highest range (15-25%) is reserved for the relators who provide the greatest public service-- relators whose claims are not "based upon" a public disclosure and most relators who qualify as "original sources." The lesser range (up to 10% of the proceeds) is provided for the (presumably unusual) cases in which an "original source" relator asserts a claim that is "primarily based" on information that has been publicly disclosed and that the relator did not provide.

In contrast with the government's position, the relators' position produces results that we do not think that Congress intended. First, this interpretation provides a potentially huge windfall -- 15-25% of the total recovery -- for most relators whose claims would have been dismissed under section 3730(e)(4) if the government had not intervened. It is hard to see why Congress might have wanted the fortuity of government intervention to make

17

such a difference -- or why Congress might have wanted to provide such a large reward to such a relator, who provides little if any public service. See Federal Recovery Service, Inc. v. United States, 72 F.3d 447, 452 (5th Cir. 1995) (describing a similar interpretation as "ignor[ing] the False Claims Act's goal of preventing parasitic suits based on information discovered by others" and as requiring awards in "even those [suits] brought by individuals who discovered the defendant's fraud by reading about it in the morning paper").

Second, the relators' interpretation prescribes the same range of awards -- 15-25% -- for two very dissimilar groups of relators: first, those relators who provide a substantial public service by bringing claims that are not based upon publicly disclosed information and, second, relators who furnish little if any public service because their claims are "based upon" publicly disclosed information 9 and would have been dismissed under section 3730(e)(4) if the government had not intervened. It seems unlikely that Congress wanted these two vastly different types of relators to be treated the same.

Third, the relators' interpretation treats original-source relators the same as other relators whose claims are based on publicly disclosed information. Under the relators' interpretation, if a relator's claim is "based upon" (but not "primarily based" upon) publicly disclosed information, the relator is entitled to 15-25% regardless of whether the relator is an original source. Since Congress took pains in section 3730(e)(4)(B) to provide special, favorable treatment for original-source relators, it seems unlikely that Congress wanted a relator's original-source status to be irrelevant in determining the award that a relator receives in a case in which the government intervenes.

The legislative history also supports the government's view. As Table A illustrates, under the government's interpretation, the 0% - 10% range applies only when an "original source" brings a claim that is "primarily based" on publicly disclosed information and the "original source" did not provide that information. By contrast, as previously

_____

9. But not "primarily based" upon such information.

noted, under the relators' view, this range is not restricted to "original-source" relators. In discussing the provision of S 3730(d) creating the 0% - 10% range, two of the primary sponsors of the 1986 False Claims Act amendments described the cases to which this range would apply, and both stated clearly that this range would apply only to "original sources." Senator Grassley stated:

> When the qui tam plaintiff brings an action based on public information, meaning he is an "original source" within the definition under the act, but the action is based primarily on public information not originally provided by the qui tam plaintiff, he is limited to a recovery of not more than 10 percent. In other words a 10-percent cap is placed on those "original sources" who bring cases based on information already publicly disclosed where only an insignificant amount of that information stemmed from that original source.

132 Cong. Rec. 28580 (1986) (emphasis added).

Similarly, Representative Berman commented:

> The only exception to [the] minimum 15% recovery is in the case where the information has already been disclosed and the person qualifies as an "original source" but where the essential elements of the case were provided to the government or news media by someone other than the qui tam plaintiff.

132 Cong. Rec. 29322 (1986). These statements provide strong support for our interpretation of SS 3730(d)(1) and (e)(4).

For all these reasons, we conclude that a relator whose claim is subject to dismissal under section 3730(e)(4) may not receive any share of the proceeds attributable to that claim.

III

Thus far, we have concluded that the relators' share of the proceeds must be based on a claim-by-claim analysis and that the relators are not entitled to any share of the settlement attributable to claims that would have been

19

subject to dismissal under section 3730(e)(4) prior to the government's intervention. These holdings do not necessarily dictate reversal, however, becaue the District Court also held (a) that the government waived its right to argue that the relators were not entitled to recover a share of the proceeds attributable to the "automated chemistry" claims and (b) that the government did not offer sufficient evidence to establish the share of the proceeds attributable to those claims. We now consider those issues.

A. The District Court held that, when the governme nt agreed to settle the lawsuit, it waived its right to argue that the relators were barred from recovering proceeds attributable to the automated chemistry claims. Dist. Ct. Op. at 36–37. We disagree.

The settlement agreement between the government and SKB did not dispose of any issues pertaining to the relators' share of the settlement proceeds. The agreement expressly stated that the parties would "request" that the District Court "specifically retain jurisdiction with respect to any unresolved issues, including . . . relators' share of the settlement proceeds." Joint App. at 214. The Court's order dismissing the actions stated: "this Court retains jurisdiction over . . . determination of . . . relators' share issues." Joint App. at 198. Therefore, by its own terms, the settlement agreement preserved the government's right to contest the issue of the relators' share. Accordingly, we hold that the District Court erred in concluding that the government waived its right to argue that the relators were barred from recovering proceeds attributable to the automated chemistry claims.

B. The District Court also held that it had no fac tual basis upon which to determine the percentage of the settlement that was attributable to the automated chemistry claims. See Dist. Ct. Op. at 41 ("[T]here is absolutely no evidence on the record before me . . . to establish any allocation among various claims."). The District Court blamed the supposed dearth of evidence on the government, suggesting that the government refused to provide any meaningful response to the relators' discovery requests concerning the factual basis for its allocation of the settlement proceeds. Id. at 42–43.

The District Court's conclusion is not supported by the record. The record shows that the government produced substantial evidence related to the allocation of the settlement proceeds. During an evidentiary hearing before the District Court, the government introduced a series of documents--created during the government's negotiations with SKB--that specified the amount of money the government had demanded for each alleged violation of the False Claims Act. See Joint App. at 1474, 1475-1491. These documents showed that approximately $241 million were attributable to the automated chemistry claims. The relators, on the other hand, failed to present any evidence. By declining to present evidence contradicting the government's allocation of the settlement proceeds, the relators effectively gave up their right to challenge the factual basis of that allocation.

Having reviewed the record, we are satisfied that the government submitted sufficient evidence to enable the District Court to allocate the settlement proceeds on a claim-by-claim basis. Accordingly, we conclude that the District Court's finding--i.e., that there was "no evidence" upon which to determine the percentage of the settlement that was attributable to the automated chemistry claims-- was clearly erroneous.[10]

IV.

It is beyond dispute that, under our circuit's interpretation of Section 3730(e)(4) in Mistick , 186 F.3d at 385-89, the relators' automated chemistry claims were "based upon" a public disclosure specified in that provision. See Joint App. at 1432-1441, 1442-1450, 1451-1457, 1470-1473; 1492-1498. As we explained above, relators who bring such a claim cannot recover any proceeds attributable to that claim unless they qualify as original sources of information under section (e)(4)(B). The District Court therefore erred in allowing the relators to recover

_____

10. We make no determination with respect to the exact percentage of the settlement that must be attributed to the automated chemistry claims; we simply hold that the District Court had an adequate factual basis for making such a finding.

21

proceeds attributable to the "automated chemistry" claims without determining whether the relators were "original sources."

On remand, the District Court must determine whether the relators were "original sources" of information--as defined by section (e)(4)(B)--with respect to the "automated chemistry" claims. If the District Court determines that they were original sources of information, it may award them a share of the proceeds and will have to determine whether they fall within the 15-25% range or the 0-15% range as set out in Table A supra.11 However, if the District Court determines that the relators were not original sources of information with respect to those claims, it may not award them any share of the proceeds attributable to them.

V.

For the foregoing reasons, we hold that the District Court erred in awarding the relators 17% of the settlement proceeds. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit
_____

11. We express no view as to whether the Court may properly award any recovery jointly to the pertinent relators, or whether it must specify each
relator's award. Consideration of this issue would be premature until (a) it is determined under the correct legal standard that a relators' award is appropriate and (b) the issue is properly brought before us by a party with standing.

22