

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-17-2007

# USA v. Hackensack Med Ctr

Precedential or Non-Precedential: Precedential

Docket No. 06-2287

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Hackensack Med Ctr" (2007). *2007 Decisions.* Paper 659.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/659

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 06-2287

UNITED STATES OF AMERICA, EX REL;
PHIL HEFNER, UNITED STATES OF AMERICA, EX REL.

v.

HACKENSACK UNIVERSITY MEDICAL CENTER;
CENTER FOR INFECTIOUS DISEASES, P.A.;
NORTH JERSEY PRIMARY CARE ASSOCIATES, P.A.

Phil Hefner,

<u>Appellant</u>

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 01-cv-04078)
District Judge: Hon. Dennis M. Cavanaugh

Argued June 4, 2007

BEFORE: SMITH and  COWEN,
and SILER*, <u>Circuit  Judges</u>

(Filed July 17, 2007)

*Honorable Eugene E. Siler, Jr., Senior United States Circuit
Judge, U.S. Court of Appeals for the Sixth Circuit, sitting by
designation.

Victor A. Kubli, Esq. (Argued)
Grayson & Kubli
1420 Sprint Hill Road, Suite 230
McLean, VA 22102

Counsel for Appellant

Stuart A. Minkowitz, Esq.
Office of the United States Attorney
970 Broad Street, Rm. 700
Newark, NJ 07102

Michael E. Robinson, Esq.
United States Department of Justice
Civil Division, Appellate Staff
601 D. Street, N.W.
Washington, DC 20530

Eric J. Feigin, Esq. (Argued)
United States Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Counsel for Appellee United States of
   America, ex rel.

John Z. Jackson, Esq. (Argued)
Kalison, McBride, Jackson & Murphy
25 Independence Boulevard, 4th Floor
Warren, NJ 07059

Counsel for Appellee Hackensack Medical
   Center

Joseph M. Gorrell, Esq. (Argued)
Brach, Eichler, Rosenberg, Silver,
  Bernstein, Hammer, Gladstone
101 Eisenhower Parkway
Roseland, NJ 07068

Counsel for Appellee Center for Infectious
  Diseases, P.A.

John H. Schmidt, Jr., Esq. (Argued)
Lindabury, McCormick, Estabrook
  & Cooper
53 Cardinal Drive
P.O. Box 2369
Westfield, NJ 07091

Counsel for Appellee North Jersey Primary
  Care Associates, P.A.

---

OPINION

---

COWEN, Circuit Judge.

Phil Hefner appeals from an order entered by the United States District Court for the District of New Jersey, denying reconsideration of its order granting summary judgment in favor of defendant-appellees, and denying an alternate remedy pursuant to 31 U.S.C. § 3730(c)(5). For the reasons stated below, we will affirm.

I.

Hackensack University Medical Center ("HUMC") operates a medical university and hospital. The North Jersey Primary Care Associates, P.A. ("NJPC"), a professional service corporation that is effectively controlled by HUMC, manages HUMC's physician staffing. HUMC provides treatment to patients with infectious diseases at the Infectious Diseases Clinic

3

(the "Clinic" or the "HUMC Clinic"), among other clinics.

Dr. Steven Sperber, a board-certified infectious disease physician, treated patients at the HUMC Clinic. He did so in his individual capacity through an agreement with NJPC, not as a member of the Center for Infectious Diseases ("CID"), which is a private practice of infectious disease physicians, including Sperber. Incidentally, the CID and HUMC are separate entities, although CID leased some medical office space from, and used the support services of, HUMC.

The services which Dr. Sperber provided at the HUMC Clinic were covered under a grant, specifically, the National Institute of Health Ryan White Title I Grant ("the Grant"), which provided federal funding for the treatment of AIDS patients. Maryann Collins, the AIDS Coordinator for HUMC, applied for and administered the Grant on behalf of HUMC.

To administer the Grant, Collins submitted to the government monthly invoices itemizing the allowable services and requesting reimbursement. In support of the invoices, Collins signed certifications that included the following:

> I certify that none of the above service units have been previously submitted and paid; all of the billable units are in compliance with the authorized budget and contracted for scope of service. Additionally, all services below have been provided and/or delivered as specified.

One of the conditions of the Grant was that it could not be used to replace existing financial support. Thus, the Grant provided "[f]unds may not be used to provide items or services for which payment has already been made or can reasonably be expected to be made by a third-party payer, including . . . Medicare." HUMC understood this provision to mean that it was entitled to reimbursement by the Grant for services that were payable by Medicare, as long as it did not bill Medicare. This was an incorrect interpretation, as confirmed by a study conducted by the Grant's administrator, the Health Resources

4

and Services Administration ("HRSA"), which determined that Medicare should be the payer of first resort. The HRSA study also found, however, that 85% of hospitals surveyed had billing problems arising from third-party payer/grant situations.

Nevertheless, HUMC failed to conform to even its incorrect interpretation of its responsibilities under the Grant. While Collins included fees for Dr. Sperber's services in grant invoices, HUMC also charged Medicare for the same services. This was caused by a breakdown in HUMC's billing system. According to Thomas Flynn, HUMC's Director of Compliance, billing information was generated by physicians and then sent to the physician billing department. There, billing staff clerks entered claims into the system. Flynn explained that for claims that were reimbursable by the Grant, the clerk was supposed to enter an allowance code that would indicate as much. However, because there had been some staff turnover, the staff member who was responsible for entering the allowance code was not doing so. This left a receivable in the system, which caused bills to go out to Medicare.

In June 2000, Marilyn Capek, an administrator at CID, received a form from NJPC asking Dr. Sperber to reassign his payments from Medicare to NJPC. Capek thought that Dr. Sperber's services at HUMC were being paid for by the Grant, so she called Collins to ask about the discrepancy. Collins promised to investigate and then passed along this information to Flynn. Flynn instructed the physician billing staff to run a report to determine if any claims connected to Dr. Sperber's work had been submitted to Medicare. When the report disclosed that claims had been submitted to Medicare, such billing was stopped, and Flynn began reviewing the records to determine how many claims had been submitted in error so that HUMC could repay Medicare.

Around this time, HUMC engaged the services of Health Systems Management Network ("HSMN"), a consulting firm, to help improve its compliance with documentation and billing regulations. Relator Hefner was hired by HSMN on June 20, 2000, and was assigned to HUMC on July 5, 2000. The next

5

day, Hefner had a meeting with Theodore Tarantini, the senior managing partner of HSMN, and Mark Clachko, a member and chairman-elect of the HUMC Medical Board. Hefner arrived at the meeting two hours late, looking disheveled, and provided a "totally outrageous" excuse for his tardiness. Tarantini concluded that Hefner was an alcoholic, a big problem for HSMN, and was not up to doing his job. Soon after this meeting, Hefner had a second meeting with Tarantini, and again arrived looking disheveled.

Clachko was also unhappy with Hefner's performance. After a July 11, 2000 meeting with Hefner, Clachko told the co-chairman of performance improvement and quality assurance at HUMC that he was "extremely, extremely upset" with Hefner, and that Hefner "was inappropriate, acted very strange, and did not offer any advice or suggestions on any corporate compliant [sic] issues." Clachko was apparently so upset with Hefner that he was ranting and raving. After this conversation, HUMC called HSMN and asked that Hefner be replaced.

After Hefner and Clachko's meeting, Hefner met with Capek. During this meeting, Capek told Hefner that she had come across some paperwork that suggested there might be a problem with double billing concerning the Grant. Capek also stated, however, that she had brought it to HUMC's attention and the company was working on remedying the problem. During her deposition, Capek referred to the act of double billing as a "fraud." She stated, "Well, you can't bill Medicare and receive federal grants at the same time, that's fraud."

Immediately after this meeting, HUMC ordered Hefner off HUMC premises. Hefner was officially terminated by HSMN six days later.

In September 2000, HUMC informed Medicare that services reimbursed under the Grant had been wrongly charged to Medicare. HUMC then returned the payments–totaling $5258.97–to Medicare.

II.

6

Hefner filed a *qui tam* action under seal in the United States District Court for the District of Maryland against HUMC. Thereafter, the United States filed a Notice of Election to Decline Intervention, and the complaint was unsealed. The matter was transferred to the District of New Jersey, and Hefner filed an amended complaint that added NJPC and CID as defendants.

Hefner's amended complaint contained three claims under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33: (1) submitting false claims and false invoices; (2) making false records and false statements; and (3) retaliatory discharge. After discovery, the District Court granted summary judgment to all defendants on all counts. Hefner moved for partial reconsideration. Hefner also requested that, if the District Court denied his motion for reconsideration, he receive a share of HUMC's repayment to the government as an alternate remedy to his FCA action. The District Court denied Hefner's motion for reconsideration and denied his request for a share of the administrative repayment. Hefner now appeals.

III.

We have jurisdiction over this appeal by virtue of 28 U.S.C. § 1291. The District Court's order granting appellees' motions for summary judgment is subject to plenary review. *Carter v. McGrady*, 292 F.3d 152, 157 (3d Cir. 2002).[1] We review the District Court's order denying reconsideration of its

---

[1] Although Hefner did not specify the order granting summary judgment in his notice of appeal, we will exercise jurisdiction over the unspecified order because there is a definite connection between the order denying the motion for reconsideration of the order granting summary judgment and the summary judgment order itself. *See Williams v. Guzzardi*, 875 F.2d 46, 49 (3d Cir. 1989). Moreover, appellees have not been prejudiced by Hefner's failure to specify the summary judgment order in the notice of appeal since they have fully briefed the issue of whether the grant of summary judgment was appropriate.

order granting summary judgment for an abuse of discretion. *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985). Finally, we engage in a de novo review of the District Court's order denying an alternate remedy pursuant to 31 U.S.C. § 3730(c)(5), because the issue turns on a question of law. *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 146 (3d Cir. 2005).

IV.

Hefner presents four arguments on appeal. First, he argues that the District Court should not have granted summary judgment to HUMC and NJPC on his first and second FCA claims because he presented evidence that their conduct satisfied the FCA's scienter requirement. Second, he argues that the District Court should not have granted summary judgment to CID on his FCA claims because CID operated as an integrated enterprise with HUMC and NJPC. Third, he argues that he presented sufficient evidence to withstand summary judgment on his retaliatory discharge claim. Finally, he argues that the District Court erred in ruling that he was not entitled to a share of HUMC's repayment to the government. We consider each argument in turn below.

A.

Hefner argues that the District Court erred in granting summary judgment to HUMC and NJPC on his FCA claims. He posits that when HUMC submitted bills to both the Grant and Medicare, it violated the statute. For the reasons stated below, we agree with the District Court that Hefner did not present sufficient evidence for a reasonable jury to conclude that appellees' conduct satisfied the FCA's scienter requirement.

To establish a prima facie case under the FCA, the relator must prove: "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 182 (3d Cir. 2001). Here, it is

8

undisputed that Hefner established the first and second prongs. However, the District Court ruled that Hefner failed to present sufficient evidence for a reasonable jury to conclude that appellees knew the claims were false or fraudulent, which is the only issue now in dispute.

The False Claims Act defines "knowing" as including a defendant's "actual knowledge," "deliberate ignorance," or "reckless disregard" of the truth or falsity of information in the defendant's claim to the government. 31 U.S.C. § 3729(b). Further, "no proof of specific intent to defraud is required." *Id.* Congress specifically expressed "'its intention that the act not punish honest mistakes or incorrect claims submitted through mere negligence.'" *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1073 (9th Cir. 1998) (quoting S. Rep. No. 99-345, at 7 (1986)).

Hefner has presented no evidence that appellees had actual knowledge that the claims they submitted were false. He argues that his case is analogous to *United States ex rel. Cantekin v. University of Pittsburgh*, 192 F.3d 402 (3d Cir. 1999), where we did find evidence of actual knowledge of falsity. In *Cantekin*, the relator submitted an affidavit stating that he had told the defendant that he should disclose his industry funding–which was the subject of the FCA claim–to the government. *Id.* at 411. According to the affidavit, the defendant rejected this suggestion, stated that his other grants were none of the government's business, and then continued to omit reference to the industry funding. *Id.* This certainly presents evidence that the defendant knew the disclosure forms he submitted to the government were false: he was approached with evidence that he was submitting false claims, expressed no interest in correcting the falsehood, and continued to submit the false statements.

Here, on the other hand, Hefner has not presented any evidence showing that the individuals submitting the claims to the government knew that they were submitting false claims. Although Hefner claims that the appellees' knowledge is established by virtue of Capek's statements to him indicating that

9

HUMC was double billing and engaging in "fraud,"[2] Capek was not the one submitting the claims; she was the one who happened to catch the error. And when she realized what had happened, she informed HUMC staff, who rectified the problem. Capek's after-the-fact interpretation of the situation does not establish that the individuals submitting the claims knew that they were submitting false claims. Indeed, in Capek's deposition testimony, she explained how she perceived the situation: "I felt that something had slipped through the cracks, they weren't aware of it." Hefner has presented no evidence of actual knowledge except this insufficient statement of Capek's, and accordingly, the District Court was correct to reject this argument.

Moreover, Hefner has failed to present sufficient evidence for a reasonable jury to conclude that appellees' billing errors were made in reckless disregard of their truth. He argues that because Collins "didn't do anything" to ensure that the certifications she submitted to the Grant were correct, she was reckless. However, Collins explained that she did not do anything because she "work[ed] in a system whereby different parts of the system are in place to assure [compliance], and to the best of my knowledge, they were in place, and what I wrote down and what I signed off to was what I believe[d] to be true." Hefner has presented no evidence that Collins had reason to believe that the billing system employed by HUMC was not up to the task of separating Medicare and non-Medicare bills, and accordingly, her failure to call the billing department about every claim to ensure that it had not been billed elsewhere was not reckless.

Hefner also argues that appellees were reckless because

---

[2] Even if Capek did describe the conduct as fraud, her deposition testimony demonstrates that her use of the word "fraud" does not say anything about her evaluation of the person's state of mind, which is the only issue here. When discussing the double billing, she stated "Well, you can't bill Medicare and receive federal grants at the same time, that's fraud."

10

they did not have a compliance system in place. However, this distorts the record. In 1998, HUMC created a compliance department, with Flynn as director. Part of the compliance department's responsibility was to manage and audit medical records, coding, and billing–which includes Medicare claims. This department formalized practices that were already in place. Although it is true that the compliance department was not concerned with invoices sent to the Grant, it was actually on the Medicare side–which the department did monitor–where the system broke down. The mere failure of a system to catch an error does not establish recklessness. *See Wang v. FMC Corp.*, 975 F.2d 1412, 1420-21 (9th Cir. 1992) (poor job performance and innocent mistakes are not actionable under the False Claims Act).

HUMC's lack of recklessness is also demonstrated, at least indirectly, by its hiring HSMN to help it improve its compliance. Furthermore, there is no evidence that the government had any idea about the double billing, and thus HUMC's repayment to the government appears entirely voluntary. As the Seventh Circuit has explained, "[j]udging by the apparently satisfactory conclusion in the eyes of the Medical Center and the government's refusal to take up this action, it appears that no party to the incident believes any harm was done." *Hindo v. Univ. of Health Sciences/The Chi. Med. Sch.*, 65 F.3d 608, 614 (7th Cir. 1995).

Accordingly, we agree with the District Court's conclusion that Hefner presented insufficient evidence for a reasonable jury to find liability against HUMC and NJPC under the FCA. Moreover, because we conclude that HUMC and NJPC were not liable, *a fortiori*, CID cannot be held liable under an integrated enterprise or agency theory. Hence, we will affirm the grant of summary judgment to all appellees on the first and second FCA claims and affirm the denial of the motion for reconsideration.

B.

Hefner next argues that he was terminated from his

11

position at HSMN in retaliation for his investigation of HUMC's fraud, in violation of 31 U.S.C. § 3730(h). In order to establish a claim under § 3730(h), Hefner must show "(1) he engaged in protected conduct, (i.e., acts done in furtherance of an action under § 3730) and (2) that he was discriminated against because of his protected conduct." *Hutchins*, 253 F.3d at 186 (internal quotation marks omitted). For a plaintiff to demonstrate that he was discriminated "against 'because of' conduct in furtherance of a False Claims Act suit, a plaintiff must show that (1) his employer had knowledge he was engaged in 'protected conduct'; and (2) that his employer's retaliation was motivated, at least in part, by the employee's engaging in 'protected conduct.'" *Id.*

Hefner alleges that he was engaging in protected conduct when he learned about billing irregularities from Capek. Even if we accept this statement, there is no evidence in the record that Hefner's employer–whether construed as HSMN or HUMC–knew that he was acting in furtherance of an FCA claim when it fired him. All the evidence in the record shows that Hefner was removed from the HUMC building almost immediately after he met with Capek and before he talked to anyone from HUMC about what he had learned. The record is entirely bereft of evidence that Hefner's employer knew that he was engaged in protected conduct. The District Court was thus correct to grant summary judgment against Hefner on this claim.

C.

Hefner's final argument is that the District Court was wrong to reject his claim to a share of the money repaid by HUMC to the government. Under the FCA, the United States may "elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty." 31 U.S.C. § 3730(c)(5). If the government does pursue an alternate remedy, however, "the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section." *Id.* Hefner argues that when the government accepted the repayment from HUMC, it pursued an alternate remedy under § 3730(c)(5), and he is

12

therefore entitled to a share of the proceeds. The government argues, on the other hand, that it would be perverse to permit Hefner any recovery because his underlying FCA suit is meritless.[3]

This Court has not considered the issue of whether a relator has a legal right to recover a share of the proceeds of an alternate remedy when his *qui tam* action is invalid. In *United States ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97, 106 (3d Cir. 2000), we addressed a related issue: whether a *qui tam* relator whose claim is subject to dismissal for being based on publicly disclosed information is entitled to a share of settlement proceeds attributable to that claim. We ultimately concluded that such a relator is not entitled to a share of the government's proceeds, but our analysis was based upon a close "examin[ation] [of] both section 3730(e)(4) and section 3730(d)." *Id.* at 103. Since this case does not implicate § 3730(e)(4), we do not view *Merena* as controlling authority for the government's position in this case. But taking our cue from *Merena*, we will engage in a close examination of the applicable statutory provisions in determining whether a relator, whose *qui tam* claims are proven invalid, is entitled to any share of the proceeds of an alternate remedy attributable to those claims.

In analyzing the issue before us, we are aided by the opinions of two of our sister courts. In *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 342 F.3d 634, 650 (6th Cir. 2003), the Court of Appeals for the Sixth Circuit opined that "a threshold requirement for a relator's ability to share in the proceeds of a FCA lawsuit is to file a valid *qui tam* action." There, the government argued that because the relator had failed to comply with Rule 9(b)'s heightened pleading requirement, he was not entitled to share in the government's settlement with the

---

[3] The government alternatively argues that it never pursued an "alternate remedy" within the meaning of 31 U.S.C. § 3730(c)(5). Because we conclude that Hefner does not have a right to share in the repayment because his *qui tam* claim lacked merit, we need not reach the government's alternative argument.

defendant health care provider.  *Id.*  Citing to § 3730(b)(1), which permits the relator to bring "a civil action for a violation of section 3720," the court agreed that a valid *qui tam* action is a "threshold requirement" for a relator's eligibility to share in an alternate remedy.  *Id.*  Ultimately, however, the court decided to remand the case to give the relator an opportunity to replead, thereby allowing the case to proceed. *Id.*

Like the Sixth Circuit, the Court of Appeals for the Ninth Circuit has recognized that a valid *qui tam* action is a prerequisite to a relator's right to recover.  *See Donald v. University of California Board of Regents*, 329 F.3d 1040 (9th Cir. 2003).  In *Donald*, the relators filed a *qui tam* suit against the Regents of the University of California, in which the government intervened and then negotiated a settlement.  The government subsequently broke off negotiations with the relators, reasoning that under recent Supreme Court precedent, "a private party may not bring a *qui tam* action against a state entity under § 3729(a) of the FCA." *Id.* at 1044.  The court agreed that the relators had no statutory right to a recovery under the FCA because "[a] private party . . . has a legal right to recovery only from a *qui tam* action brought pursuant to § 3730(b)(1), which is in turn dependent on the private party having a valid cause of action under § 3729(a)." *Id.* Thus, the invalidity of the *qui tam* action foreclosed the relators' claim to a share of the government's proceeds from its settlement.  *Id.*; *see also id.* at 1044 n.5 ("[A] relator has a right to recover a share of the proceeds of the alternate remedy to the *same degree that he or she would have been entitled to a share of the proceeds of an FCA action*." (internal quotation marks omitted)).

Like our sister courts, we read the relevant statutory provisions to mean that a relator is not entitled to a share in the proceeds of an alternate remedy when the relator's *qui tam* action under § 3729 is invalid:  As § 3730(c)(5) provides, a relator's rights in an alternate remedy proceeding are the "same rights" that the relator would have had if the action had proceeded under the FCA.  The relator's rights to a *qui tam* award in an FCA action are delineated in § 3730(d), which section applies only in "an action brought by a person under subsection (b)."  *Id.* §

14

3730(d)(1).  Subsection (b), in turn, refers to an action brought for "a violation of section 3729."  *Id.* § 3730(b)(1).  The statute evinces no intent to compensate relators who bring unfounded § 3729 claims, whether the claims are legally or factually unfounded.

Because Hefner's *qui tam* action is invalid for failing to present evidence that the false claims were knowingly submitted, he is not entitled to a share of the government's repayment. Accordingly, we find no error in the District Court's order denying him a share of the alleged alternate remedy.

For the foregoing reasons, the judgment of the District Court entered on March 27,  2006 will be **AFFIRMED**.