# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-3764

_____

|  |  |  |
|---|---|---|
| United States of America ex rel. Pat Costner; Sharon Golgan; Carolyn Lance; Debra Litchfield; Becky Summers; Kenny Brown; Edward Campbell; Don Daniel; Jeffrey Foot; David Hermanson; Arkansas Peace Center; Vietnam Veterans of America, Arkansas State Council, Inc., | * * * * * * * * * | |
| Plaintiffs/Appellants, | * | Appeal from the United States District Court for the Eastern District of Arkansas. |
| | * | |
| v. | * | |
| | * | |
| United States of America, | * | |
| | * | |
| Movant, | * | |
| | * | |
| URS Consultants, Inc.; Morrison Knudsen Corporation; MRK Incineration, Inc.;  Vertac Site Contractors, | * * * * | |
| | * | |
| Defendants/Appellees. | * | |

_____

Submitted:  November 4, 2002

Filed:  January 28, 2003

_____

Before WOLLMAN, FAGG, and LOKEN, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

This is a <u>qui</u> <u>tam</u> action brought on behalf of the United States by the plaintiffs as relators pursuant to the False Claims Act (FCA), 31 U.S.C. §§ 3729-3733. The complaint alleges that URS Consultants, Inc. (URS), Morrison Knudsen Corporation (MK), MRK Incineration, Inc. (MRK), and Vertac Site Contractors (VSC) conspired to submit false claims for payment under a government contract for the treatment and disposal of hazardous waste at the Vertac Chemical Plant site in Jacksonville, Arkansas. The plaintiffs appeal the district court's[1] judgment in favor of the defendants. We affirm.

I.

The plaintiffs filed this False Claims Act suit in 1995. The suit arises out of the defendants' contract with the Environmental Protection Agency to clean up a contaminated industrial site known as the Vertac site. We set out the history of the site and this litigation in a prior appeal:

> From 1948 to 1987, the Vertac site was home to various chemical, herbicide, and pesticide production facilities. Throughout the years, chemical waste from such activity was deposited in landfills and stored in drums or barrels above ground with little or no attention to human health or environmental consequences. As a result, the site became extremely contaminated with dioxin and other highly toxic chemicals. The United States Environmental Protection Agency (EPA) has placed the site on the Superfund National Priorities List.
> . . .

---

[1]The Honorable James M. Moody, United States District Judge for the Eastern District of Arkansas.

Substantial cleanup began in 1987, following Vertac Chemical's abandonment of the site. After learning that approximately 28,000 corroding and leaking drums of toxic waste had been left on the premises, the EPA initiated an emergency removal action pursuant to section 9604 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § § 9601-9675 (1995 & Supp. 1998). The state then negotiated a contract for on-site incineration of the waste with MRK Incineration, Inc., which subsequently assigned the contract to Vertac Site Contractors, a joint venture composed of MRK and MK Environmental Services, a division of Morrison Knudsen Corp.

. . .

Pursuant to the agreement, the state imposed various conditions regarding the operation of the incinerator constructed by the contractors, but certified that the contractors had demonstrated the ability to satisfy state and federal regulations. In 1991, the district court approved and entered an additional consent decree. The EPA remained involved in the cleanup by monitoring air quality, handling and transporting the drums of waste to be incinerated by the contractors, and disposing of incinerator ash.

In 1992, after it became clear that the trust fund would not be sufficient to complete the cleanup, the EPA assumed primary responsibility for the site and approved a federal removal action using federal funds. When the trust fund was depleted, the state terminated its contract with Vertac Site Contractors. Soon after, the EPA assigned general oversight authority of the site to URS Consultants, Inc. URS then entered into a contract with Vertac Site Contractors to continue incineration activities. In 1995, the EPA transported the remaining drums of toxic waste to a site in Kansas for incineration.

Costner v. URS Consultants, Inc., 153 F.3d 667, 671-72 (8th Cir. 1998) (citations omitted) (Costner I).

The EPA assumed responsibility for the project on June 8, 1993. The EPA executed an agreement with URS, giving URS general oversight authority over the

incinerator and authorizing it to contract with VSC to continue VSC's incineration operations. From the start of the cleanup, the EPA had a Remedial Project Manager, a team of engineers, a risk assessment specialist, and other scientists assigned to the site. URS and VSC produced daily, weekly, and monthly reports concerning site operations, as well as air monitoring reports, quality assurance reports, and other regulatory compliance reports. In response to allegations made by the plaintiffs and others during the course of operations, the EPA conducted investigations into intentional tampering and regulatory violations. The investigators suggested improvements, improvements were made, and the EPA continued to make payments under the contract.

The plaintiffs allege that before and during the course of the contract the defendants concealed operational problems and numerous regulatory violations from the EPA. They contend that in light of this concealment the defendants' requests for payment constituted false claims under the FCA. After extended discovery, the district court granted summary judgment to the defendants on all claims except those that alleged tampering with monitoring devices. The district court then dismissed certain of the tampering claims, finding they had been pled with insufficient particularity. After trial on the remaining two tampering claims, the district court entered judgment in favor of the defendants on all claims.

II.

We review the district court's grant of summary judgment de novo, applying the same standards as the district court and viewing the evidence in a light favorable to the nonmoving party. Hammond v. Northland Counseling Ctr., Inc., 218 F.3d 886, 891 (8th Cir. 2000). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Once the party moving for summary judgment has demonstrated that the record contains no genuine issue on a material fact, the burden is on the

nonmoving party to present affirmative evidence raising a genuine issue as to that fact.  Hammond, 218 F.3d at 891 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

## A.  Materiality

The False Claims Act imposes liability on "[a]ny person who knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval."  31 U.S.C. § 3279(a).  In addition, several courts have required that the falsehood in the claim must be material to the payment decision.  The district court dismissed all but two of the plaintiffs' claims for failure to present affirmative evidence raising a genuine issue of material fact regarding the materiality of the defendants' alleged misstatements and omissions.  The existence of and appropriate standard for a materiality element is a matter of some disagreement in the courts.  See, e.g., United States, ex rel. Cantekin v. Univ. of Pittsburgh, 192 F.3d 402, 415-16 (3d Cir. 1999) (declining to decide whether such an element exists because the claims at issue would easily qualify); United States v. Southland Mgmt. Corp., 288 F.3d 665, 674-78 (5th Cir.) (questioning existence of materiality element, but finding that false certification of compliance with condition required for payment satisfied even strict outcome materiality standard), reh'g en banc granted, 307 F.3d 352 (5th Cir. 2002); Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 785 (4th Cir. 1999) (applying materiality requirement that depends on "whether the false statement has a natural tendency to influence agency action").

Although we have not heretofore directly considered whether a materiality element is implicit in the Act, we have stated that the Act provides recovery from one "who makes a material misrepresentation to avoid paying some obligation owed to the government."  United States v. Q Int'l Courier, Inc., 131 F.3d 770, 772 (8th Cir. 1997).  Moreover, our decision in Rabushka ex rel. United States v. Crane Co.

suggests that outcome materiality is the proper standard. 122 F.3d 559, 563 (8th Cir. 1997) ("If Rabushka cannot show that the PBGC would have terminated CF&I's pension plan [if it had known of the misrepresentations and nondisclosures], then there is no false claim because . . . liabilities would have occurred regardless of Crane's actions."). In our prior decision in this case we implied a materiality standard stricter than mere relevancy: "only those actions by the claimant which have the purpose and effect of causing the United States to pay out money it is not obligated to pay . . . are properly considered 'claims' within the meaning of the FCA." Costner I, 153 F.3d at 677. We need not decide the precise contours of the materiality requirement, however, because we hold that the plaintiffs have failed to produce evidence raising a genuine issue of material fact as to whether the allegedly withheld information was even relevant to the EPA's payment decision.

In rejecting most of the plaintiffs' claims, the district court found that although the EPA undisputably was informed of the operational problems from at least three sources, it nonetheless continued to approve monthly payments. The record contains extensive documentation revealing the inspections conducted by the EPA, the reports sent to the EPA by the defendant contractors and on-site EPA personnel, and the information obtained by the EPA through the plaintiffs' previous lawsuits and other complaints. The EPA did not consider the operational difficulties encountered by the defendants to be contractual violations. The EPA worked with the defendants to resolve problems as they arose and to improve the efficiency of the process. The plaintiffs argue that the EPA was unaware of the extent of the problems and that complete knowledge would have been material to the payment decisions. Only with respect to the allegations of tampering with the PT-125 kiln draft monitor did the plaintiffs produce evidence that the EPA's payment decision would have probably been affected if it had known of a particular omission. Accordingly, the district court did not err in granting summary judgment to the defendants on all but the PT-125 kiln draft monitor claims.

-6-

## B. Government Knowledge

The EPA's knowledge of operational difficulties also bears on whether the defendants had the requisite intent under the Act. "[I]f the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim." United States ex rel. Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 (4th Cir. 2002) (quoting United States ex rel. Durcholz v. FKW, Inc., 189 F.3d 542, 543 (7th Cir. 1999)). A contractor that is open with the government regarding problems and limitations and engages in a cooperative effort with the government to find a solution lacks the intent required by the Act. United States ex rel. Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 327 (9th Cir. 1995) (citing Wang ex rel. United States v. FMC Corp., 975 F.2d 1412, 1421 (9th Cir. 1992)). Similarly, we have held that "simple contract breaches . . . cannot provide evidence of a knowing violation of the [False Claims] Act." United States ex rel. Norbeck v. Basin Elec. Power Coop., 248 F.3d 781, 795 (8th Cir. 2001).

The plaintiffs contend that several of the alleged omissions raise a genuine issue of fact sufficient to preclude summary judgment. First, the plaintiffs cite dioxin levels recorded by on-site air monitors. The record reflects, however, that this data was available to the EPA, although it was not frequently examined because the EPA did not view production of the data as a required part of the contract. Second, the plaintiffs cite kiln puffs and kiln leaks and the causes thereof. Again, the record reflects that from the beginning the EPA knew of ongoing problems with kiln puffs and kiln leaks. The kiln puffs were cited as the reason the EPA took over cleanup operation from the state. Third, the plaintiffs cite tampering with the stack gas monitors by opening the incinerator rod ports. The EPA's on-site Remedial Project Manager testified that the rod ports were regularly opened for maintenance purposes during incineration operations. The plaintiffs have directed us to no evidence that the rod ports were open for an improper purpose. Fourth, the plaintiffs cite the

defendants' 1994 OSHA violations. The record shows that the EPA discussed these problems with the defendants and referred the matter to OSHA for investigation and possible sanctions. Although the record indicates that the defendants' performance under the contract was not perfect, the extent of the government's knowledge through its on-site personnel and other sources shows that, as in Durcholz, the "government knew what it wanted, and it got what it paid for." Durcholz, 189 F.3d at 545. Thus, the district court did not err in finding that the defendants' openness with the EPA about their problems and their close working relationship in solving the problems negated the required scienter regarding these issues.

## C.  Rule 9(b) Particularity

We review de novo the district court's dismissal of a claim for failure to plead with particularity.  Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co., 48 F.3d 1066, 1069 (8th Cir. 1995).  A complaint alleging violations of the False Claims Act must be pled with particularity pursuant to Rule 9(b).  United States ex rel. Russell v. Epic Healthcare Mgmt. Group, 193 F.3d 304, 308 (5th Cir. 1999).  This particularity requirement demands a higher degree of notice than that required for other claims.  The claim must identify who, what, where, when, and how.  Parnes v. Gateway 2000, Inc., 122 F.3d 539, 550 (8th Cir. 1997) (applying Rule 9(b) to a securities fraud claim).  Rule 9(b) is to be read in the context of the general principles of the Federal Rules, the purpose of which is to simplify pleading.  Thus, the particularity required by Rule 9(b) is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations.  Abels v. Farmers Commodities Corp., 259 F.3d 910, 920-21 (8th Cir. 2001).

The only claims that survived the district court's rulings on materiality and scienter were those relating to allegations of intentional tampering with the PT-125 kiln draft monitor, a measuring device on the waste incinerator.  After five years of discovery, the plaintiffs alleged that tampering occurred once on July 14, 1992, once

in mid-July 1993, and on other unspecified occasions. The alleged illegal act is the omission of a material fact in a claim for payment. To defend against the charge, the defendants must either dispute the occurrence of the alleged acts or attempt to prove that they adequately disclosed the acts to the government. Because the plaintiffs did not provide any information regarding the identity of those who allegedly tampered with the monitors or when such tampering occurred, the complaint is "not specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." United States ex rel. Lee v. Smithkline Beecham Clinical Labs., 245 F.3d 1048, 1051-52 (9th Cir. 2001). Without information as to who tampered with the monitors and how and when the tampering occurred, the defendants would be largely unable to respond with contemporaneous witnesses and documents and expert witnesses to testify as to whether the monitoring data is consistent with tampering of the sort alleged to have occurred. Thus, the district court did not err in dismissing the claim of tampering on unspecified occasions and allowing the plaintiffs to proceed to trial only on the claims of tampering on July 14, 1992, and mid-July 1993.

We find the plaintiffs' remaining arguments to be without merit.

The judgment is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.