# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-3888
No. 01-3891

_____

Patrick M. Hays; United States   *
ex rel. Patrick M. Hays,   *
  *
   Plaintiffs - Appellees/   *
   Cross Appellants,   *
  *
United States of America,   *   Appeals from the United States
  *   District Court for the
   Intervenor on Appeal,   *   District of Minnesota.
  *
   v.   *
  *
Luverne Hoffman, et al.,   *
  *
   Defendants - Appellants/   *
   Cross Appellees.   *

_____

Submitted: November 4, 2002

Filed: April 9, 2003

_____

Before WOLLMAN, FAGG, and LOKEN,* Circuit Judges.

_____

LOKEN, Circuit Judge.

_____

*The Honorable James B. Loken became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 1, 2003.

Patrick M. Hays was fired by St. Francis Health Services of Morris, Inc. (SFHS), the day after Luverne Hoffman, the chief executive officer of SFHS, learned that Hays had sent whistleblower letters to the Minnesota Department of Human Services (DHS), the agency that administers the Medicaid program in Minnesota. Prompted by Hays's letters, DHS conducted a field audit of the numerous nursing homes and intermediate care facilities operated by SFHS. The audit resulted in several downward adjustments to SFHS's payment rates because of noncompliance with the Medicaid reimbursement rules. Hays obtained copies of the audit reports and commenced this action under the federal False Claims Act (FCA), 31 U.S.C. §§ 3729-3733, asserting a claim for retaliatory discharge, see 31 U.S.C. § 3730(h), and qui tam[1] claims seeking damages and civil penalties for false or fraudulent claims for Medicaid payments, see 31 U.S.C. §§ 3729(a), 3730. Hays sued SFHS, eight of its operating subsidiaries, Hoffman, and Kay Knock, another SFHS corporate officer.

Defendants moved to dismiss the qui tam claims, arguing the district court lacked subject matter jurisdiction by reason of the FCA's public disclosure bar. See 31 U.S.C. § 3730(e)(4). The district court denied that motion, later explaining its analysis during the jury instructions conference. After trial, the jury found that defendants had submitted false claims regarding eleven different items, but that these false claims caused *no* measurable damages to the United States. The district court then determined that defendants submitted a total of 336 false claims and imposed the statutory minimum $5,000 fine for each false claim, resulting in a total fine of $1,680,000. The jury also found that SFHS and Hoffman unlawfully retaliated when they fired Hays and awarded him $771,736 for lost wages and benefits on that claim. The court entered judgment for $1,680,000 plus $771,736 plus interest on the back pay component of the retaliation award plus costs and attorney's fees.

---

[1]A qui tam action is one in which a private plaintiff sues on behalf of the government under a statute that awards part of any penalty recovered to the plaintiff and the remainder to the government.

Defendants appeal the qui tam portion of the judgment, raising numerous issues.[2] The United States intervened on appeal to oppose defendants' contention that the total penalty violates the Excessive Fines Clause of the Eighth Amendment and to express its views regarding the public disclosure bar issues. We conclude that the DHS audit reports were relevant public disclosures of the allegations underlying the qui tam claims, and that Hays was an original source of only one of those disclosures. Therefore, the district court lacked jurisdiction over most of the qui tam claims. We also decline to apply the district court's method of determining the number of false claims to the remaining claims and substantially reduce the total fine imposed.

## I. The Public Disclosure Bar.

First enacted in 1863, the FCA provides cash bounties to private citizens who successfully bring suit against those who defraud the federal government. The public disclosure bar at issue was part of the 1986 FCA amendments. See False Claims Amendments Act of 1986, Pub. L. No. 99-562, 100 Stat. 3153, 3157 (1986). These extensive amendments were intended to encourage private enforcement suits by legitimate whistleblowers while barring suits by opportunistic qui tam plaintiffs who base their claims on matters that have been publicly disclosed by others. See generally United States ex rel. Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp., 276 F.3d 1032, 1040-43 (8th Cir.), cert. denied, 123 S. Ct. 345 (2002); United States ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 649-51 (D.C. Cir. 1994); United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1152-54 (3d Cir. 1991); S. REP. NO. 99-345, 99th Cong., 2nd Sess., reprinted in 1986 U.S.C.C.A.N. 5266.

---

[2]In response to a question at oral argument, defense counsel suggested that the appeal includes the question whether defendants are entitled to a new trial on the retaliation claims. But that question was not included in their statement of the issues, see F.R.A.P. 28(a)(5), nor was it argued in their briefs. Accordingly, it was not preserved for appeal. That portion of the district court's judgment is affirmed.

The FCA's public disclosure bar, which Congress expressly declared to be jurisdictional, is found in 31 U.S.C. § 3730(e)(4)(A):

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless . . . the person bringing the action is an original source of the information.

The operative words in this statute have prompted extensive litigation and divergent judicial interpretations. "Virtually every court of appeals . . . agrees on one thing, however: the language of the statute is not so plain as to clearly describe which cases Congress intended to bar." United States ex rel. Findley v. FPC-Boron Employees' Club, 105 F.3d 675, 681 (D.C. Cir.), cert. denied, 522 U.S. 865 (1997). The circuits also agree that the jurisdictional inquiry turns on four questions:

> (1) whether the alleged "public disclosure" [was made by or in] one of the listed sources; (2) whether the alleged disclosure has been made "public" within the meaning of the FCA; (3) whether the relator's complaint is "based upon" this "public disclosure"; and if so, (4) whether the relator qualifies as an "original source" under § 3730(e)(4)(B).

United States ex rel. Holmes v. Consumer Ins. Group, 318 F.3d 1199, 1203 (10th Cir. 2003) (en banc). Hays, as the party invoking federal jurisdiction, bears the burden of establishing the district court's jurisdiction under the FCA. See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).

In this case, the second and third questions are beyond dispute. Hays obtained copies of the DHS audit reports through a phone call to the official in charge of the SFHS audit. That was sufficient publication of the reports. See United States ex rel.

Fine v. MK-Ferguson Co., 99 F.3d 1538, 1545 (10th Cir. 1996). Hays virtually concedes he drew the factual allegations in his qui tam complaint from the DHS audit reports. Indeed, his complaint restated the findings of the audit and attached copies of the audit reports. A suit is "based upon" a public disclosure if the allegations are "derived from" or "supported by" the disclosure. Nurse Anesthetists, 276 F.3d at 1045, 1047. Thus, the fighting jurisdictional issues in this case are whether the DHS audit reports fall within the enumerated sources of public disclosure, and whether Hays was an original source of some or all of the allegations and transactions disclosed in those audit reports.

## A. The DHS Audit Reports Were Public Disclosures.

Section 3730(e)(4)(A) provides that the source of a public disclosure must be a "criminal, civil, or administrative hearing . . . a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or . . . the news media." Only public disclosures from one of these enumerated sources may give rise to the FCA jurisdictional bar. See, e.g., United States ex rel. Rabushka v. Crane Co., 40 F.3d 1509, 1513 n.2 (8th Cir. 1994), cert. denied, 515 U.S. 1142 (1995). Hays and the United States as intervenor argue that the DHS audits and audit reports do not fall within the category of "administrative . . . report [or] audit" because they were not conducted and prepared by an agency of the *federal* government. They rely upon United States ex rel. Dunleavy v. County of Delaware, 123 F.3d 734, 745 (3d Cir. 1997), where the court reasoned that because the second use of the word "administrative" in § 3730(e)(4)(A) is surrounded by "congressional" and "Government Accounting Office," Congress must have meant to include only reports, audits, and investigations of federal government agencies. The district court noted but did not address this issue. We reject the Third Circuit's textual approach and conclude that Medicaid compliance audits and audit reports conducted and prepared by the state agency authorized to administer this cooperative federal/state program are public disclosures within the meaning of § 3730(e)(4)(A).

In the first place, applying the Third Circuit's contrary ruling to the federal Medicaid and Medicare programs would produce anomalous results. When Congress amended the FCA in 1986, it defined "claim" to include requests for money made to grantees of the federal government, see 31 U.S.C. § 3729(c). The legislative history explained this was done to clarify that false claims for FCA purposes include claims submitted to state agencies under the Medicaid program and other "State, local, or private programs funded in part by the United States where there is significant Federal regulation and involvement." S. REP. NO. 99-345 at 22, 1986 U.S.C.C.A.N. at 5287. It would be an inconsistent interpretation of the 1986 amendments to conclude that a fraudulent payment request submitted to DHS is a false claim against the United States for purposes of § 3729(c), but a DHS audit is not an "administrative audit" for purposes of § 3730(e)(4)(A) because DHS is not a federal agency.

In the second place, this subpart of § 3730(e)(4)(A) has not been rigidly limited to disclosures by federal agencies or legislative bodies in other contexts. For example, under Medicare, Congress has delegated many administrative tasks to private insurance companies. In Nurse Anesthetists, 276 F.3d at 1043-44, we described an audit performed by an insurer for the federal Department of Health and Human Services (HHS) as an "administrative audit" that could trigger the jurisdictional bar. Similarly, in United States ex rel. Schwedt v. Planning Research Corp., 39 F. Supp. 2d 28, 31-33 (D.D.C. 1999), the court held that public disclosures in an audit report prepared for the federal government by an outside accounting firm satisfied the jurisdictional bar. These cases suggest that anti-fraud compliance audits conducted by state or local agencies or private contractors should qualify as public disclosures if they are prepared by or at the behest of the relevant federal agency, or by or at the behest of a state agency that administers the federal grant program under "significant Federal regulation and involvement."

Construing the term "administrative . . . report [or] audit" in this fashion, we conclude that the DHS audits here in question, like the private Medicare audits at

issue in <u>Schwedt</u>, clearly qualify. Medicaid, codified at 42 U.S.C. §§ 1396 <u>et seq</u>., is a cooperative federal-state program through which the federal government provides financial assistance to assist States in furnishing health care to the poor. <u>See</u> <u>Wilder v. Virginia Hosp. Ass'n,</u> 496 U.S. 498, 502 (1990). State governments administer Medicaid, but they function under detailed federal statutory and regulatory controls in exchange for fifty percent federal financing. Participating States must develop a state plan for medical assistance, develop cost-based payment rates to reimburse medical providers for services rendered to eligible recipients, and designate a single agency to evaluate cost reports submitted by private vendors of health services and reimburse vendors for allowed expenses. <u>See</u> 42 U.S.C. § 1396a(a); 42 C.F.R. § 431.10(b)(1). The designated agency, here DHS, must audit records that support cost-based payments to vendors. 42 C.F.R. § 447.202. And it must adopt a Fraud Detection and Investigation Program meeting strict federal standards. The agency must conduct a preliminary investigation whenever it receives a complaint of Medicaid fraud or abuse "from any source." It must request a full investigation by the state's Medicaid Fraud Control Unit "[i]f the findings of [the] preliminary investigation give [DHS] reason to believe that an incident of fraud or abuse has occurred in the Medicaid program." 42 C.F.R. §§ 455.14, 455.15(a); <u>see also</u> MINN. STAT. § 256B.04, subd. 10. And it must report the findings of those investigations to HHS, 42 C.F.R. § 455.17(b), setting the stage for either federal or state criminal or civil enforcement actions. <u>See</u> MINN. RULES § 9549.0041, subp. 15.C.

Viewed from this perspective, the Third Circuit's decision in <u>Dunleavy</u> is readily distinguishable on the facts. The alleged public disclosure in that case was a county Grantee Performance Report submitted to the Department of Housing and Urban Development by the unit of local government accused of violating the FCA. As the Third Circuit noted, "those reports have been compiled and produced by a party whose principal motivation (assuming the truth of the fraud claim) is the elimination of the paper trail of fraud." 123 F.3d at 745. Moreover, under the federal grant program at issue in <u>Dunleavy</u> -- the Housing and Community Development Act

of 1974 -- grantee compliance audits are conducted by federal agencies, HUD and the General Accounting Office.  See 42 U.S.C. § 5304(e), (f).  Congress did not delegate that function to a state agency, as is the case with Medicaid.  Thus, while we do not disagree with the Third Circuit's decision in Dunleavy, we conclude the court ruled more broadly than necessary in stating that a state agency disclosure may never be an "administrative . . . report [or] audit" for purposes of § 3730(e)(4)(A).

### B.  Hays Was Not an "Original Source" of Most Claims.

Though we conclude all of Hays's false claim allegations were publicly disclosed in the DHS audit reports, his FCA qui tam claims are not barred by § 3730(e)(4)(A) to the extent he is an original source of the publicly disclosed information.  In the 1986 amendments, Congress defined "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action . . . based on the information."  § 3730(e)(4)(B). Thus, the original source doctrine limits the rewards of a qui tam action to one who has direct knowledge of the alleged false claims that is independent of the public disclosure, and who has functioned as a true whistleblower by volunteering his direct and independent knowledge to the government before filing suit.  "A whistleblower sounds the alarm; he does not echo it."  Hagood v. Sonoma County Water Agency, 81 F.3d 1465, 1475 (9th Cir.) (quotation omitted), cert. denied, 519 U.S. 865 (1996).[3]

Hays argues that he was an original source of all the information in the DHS audit reports because his whistleblower letters were the reason DHS conducted its field audit.  The district court agreed, commenting:

---

[3]Hays bases his claim of voluntary disclosure on his whistleblower letters to DHS, a state agency.  In our view, that is further support for our conclusion that the resulting DHS audit reports were public disclosures for purposes of § 3730(e)(4).

> If a man is able to discern a small amount of fraud and there is in fact a seething snake pit . . . and he is the one who tips off the government to it, the fact that it comes out in the investigation ought not to be a penalty against the person who made the [whistleblower] call.

On appeal, defendants and the United States as intervenor argue that this ruling is contrary to the plain language of § 3730(e)(4)(B), which requires that an original source have "direct and independent knowledge of the information on which the allegations are based." We agree. Indeed, we squarely rejected this "catalyst" theory in United States ex rel. Barth v. Ridgedale Elec., Inc., 44 F.3d 699, 703 (8th Cir. 1995), when we stated that "direct" knowledge is knowledge "marked by the absence of an intervening agency." Other circuits agree. See United States ex rel. Merena v. Smithkline Beecham Corp., 205 F.3d 97, 102 (3d Cir. 2000) ("each claim in a multi-claim [qui tam] complaint must be treated as if it stood alone"). As the Supreme Court recently held in another context, a catalyst theory may not be adopted for policy reasons if it is contrary to the plain meaning of the governing statute. Buckhannon Board & Care Home, Inc. v. W. Va. Dept. of Health & Human Resources, 532 U.S. 598, 605-10 (2001).

Thus, we must resolve the original source issue on a claim-by-claim basis. The jury found that defendants committed eleven types of false claims. On appeal, defendants concede that Hays was the original source of one allegation that was then confirmed by the DHS audit -- defendants falsely claimed that apples given as gifts to SFHS employees were a Medicaid-reimbursable food expense. However, Hays has failed to establish that he was an original source as to the other ten claims.

Most of the other claims were not volunteered by Hays in his whistleblower letters to DHS; he cannot be an original source of those claims under § 3730(e)(4)(B). As to the other claims arguably referred to in his letters, Hays argues that he was a "close observer" of the information provided because he obtained that information

from Thomas Conner, SFHS's former finance director who was himself unwilling to come forward as a whistleblower. But such knowledge is neither direct nor independent. "[A] person who obtains secondhand information from an individual who has direct knowledge of the alleged fraud does not himself possess direct knowledge and therefore is not an original source." Barth, 44 F.3d at 703. "[T]o be independent, the relator's knowledge must not be derivative of the information of others, even if those others may qualify as original sources." United States ex rel. Fine v. Advanced Sciences, Inc., 99 F.3d 1000, 1007 (10th Cir. 1996).

We conclude that Hays was the original source only of the apples allegation. Therefore, applying § 3730(e)(4)(A), the district court lacked subject matter jurisdiction over the remaining types of false claims found by the jury. That portion of the $1,680,000 total fine attributable to those claims must be vacated. In addition, as the jury verdict absolved Kay Knock of any liability for the claim concerning apples, the complaint against defendant Knock must be dismissed.

## II. What About the Apples?

In addition to challenging the district court's subject matter jurisdiction, SFHS and Hoffman appeal the adverse judgment on the apples claim, raising both liability and penalty issues.

**A.** Defendants level a three-pronged attack on the jury verdict that SFHS and Hoffman violated the FCA by claiming employee gift apples as a reimbursable Medicaid expense. First, although the DHS audit reports established that improper apple claims were made,[4] defendants argue that Hays failed to prove that any person

---

[4]The DHS regulations expressly include as non-allowable costs for nursing and intermediate care facilities "activities not related to resident care such as flowers or gifts for employees." MINN. RULES § § 9549.0036I, 9553.0036F.

-10-

knowingly submitted false claims. A person acts knowingly for purposes of the FCA if he has actual knowledge of the false information, or acts in deliberate ignorance or reckless disregard of the information's truth or falsity. 31 U.S.C. § 3729(b). But merely erroneous or negligent claims are not actionable under the FCA. See United States ex rel. Quirk v. Madonna Towers, Inc., 278 F.3d 765, 767 (8th Cir. 2002).

After careful review of the trial record, we conclude there was sufficient evidence on this issue. Viewed most favorably to the jury's verdict, the evidence established that (i) Hoffman and the SFHS internal accountants knew employee gifts were not reimbursable under the applicable Medicaid rules; (ii) gift apple invoices for a number of years were entered on SFHS general ledger accounts as "resident food"; and (iii) Hays and at least one other employee asked whether these purchases should instead be entered as employee gifts and were told by Hoffman to continue entering them as food. Defendants countered this showing with evidence that employees who prepared the Medicaid cost reports submitted to DHS were expected to exclude any non-reimbursable items entered in multi-purpose general ledger accounts such as the food account. But there was also evidence this was a haphazard, unsupervised process, permitting the jury to infer that, when Hoffman told employees to enter gift apples in the general ledger as resident food, he knew this would result in Medicaid cost reports that improperly included this item as a reimbursable food expense.[5]

---

[5]The knowing violation issue in this case is very close. On appeal, Hays relies primarily on his proof that SFHS personnel initially entered the apples as resident food in the facilities' general ledger accounts. But standing alone, that was clearly insufficient. Food purchased to feed residents is a reimbursable expense, while food purchased for other uses, such as employee gifts, is not. Hays's expert testified that, to properly exclude non-resident food, a facility "either can put it in that raw food column, *and then adjust it out*, or . . . put it in a nonreimbursable area." Thus, it required proof of a knowing failure to "adjust it out," or reckless disregard of the need to do so, to prove a knowing violation.

Second, defendants argue the district court erred in refusing to instruct that materiality is an element of an FCA violation. We recently confirmed that a showing of materiality is implicit in the FCA, though we did not define "the precise contours" of this requirement. United States ex rel. Costner v. United States, 317 F.3d 883, 887 (8th Cir. 2003). In their reply brief, defendants concede that the false claims were material if they "were capable of influencing the government's payment decision." The district court's instructions included that concept in a definition of materiality. Moreover, the record is clear that the reporting of employee gift apples as a reimbursable food expense was capable of influencing, and did in fact influence, the government's Medicaid reimbursement decisions. Thus, the instructions "taken as a whole and viewed in light of the evidence and the applicable law, fairly and adequately submitted the issues in the case to the jury." Gray v. Bucknell, 86 F.3d 1472, 1485 (8th Cir. 1996).

Third, defendants argue they were prejudiced by a number of the district court's evidentiary rulings. After carefully reviewing the record, we find no clear and prejudicial abuse of discretion. See Anheuser-Busch, Inc. v. John Labatt, Ltd., 89 F.3d 1339, 1345 (8th Cir. 1996) (standard of review), cert. denied, 519 U.S. 1109 (1997). Limited to the apples claim, the evidentiary contentions are without merit.

**B.** Turning to more difficult issues, defendants argue that Hays failed to introduce evidence supporting the district court's conclusion that 336 false claims were submitted, and that the $1,680,000 penalty violates the Excessive Fines Clause of the Eighth Amendment. We agree with the first contention. Therefore, we need not decide the second, though we agree with the Ninth Circuit that FCA penalties are punitive in nature and therefore fall within the reach of the Excessive Fines Clause. See United States v. Mackby, 261 F.3d 821, 829-31 (9th Cir. 2001).

The FCA provides that any person who knowingly makes a false claim (or causes one to be made) "is liable to the United States Government for a civil penalty

-12-

of not less than $5,000 and not more than $10,000." 31 U.S.C. § 3729(a). In determining the number of false claims for which this statutory penalty should be assessed in a particular case, the Supreme Court has cautioned that "we are actually construing the provisions of a criminal statute. Such provisions must be carefully restricted, not only to their literal terms but to the evident purpose of Congress in using those terms." United States v. Bornstein, 423 U.S. 303, 313 n.8 (1976) (quotation omitted). In Bornstein, a subcontractor made three shipments of falsely marked electron tubes to a general contractor who incorporated the tubes into radio kits billed to the government in thirty-five invoices. Rejecting the government's claim that the subcontractor committed thirty-five FCA violations, the Court held "that the focus in each case [must] be upon the specific conduct of the person from whom the Government seeks to collect the statutory forfeitures" and concluded that the subcontractor's three shipments constituted three violations. 423 U.S. at 312-13.

In this case, though the inquiry is fact-intensive, the district court treated the number of false claims as a question of law, which means we review its conclusion *de novo*. The court made its determination based upon the trial record, which was focused on other issues and is woefully inadequate for this purpose. Hays relied primarily on the testimony of Robert Rau, a former DHS auditor who had no first-hand knowledge of how SFHS facilities prepared and submitted requests for Medicaid reimbursement. Based upon his review of the DHS audit reports, Rau opined that the treatment of employee gift apples as a reimbursable food expense resulted in two hundred false claims for FCA purposes. He arrived at that number by concluding that the apples expense impacted twenty-seven annual Medicaid cost reports, and by assuming that each SFHS facility submitted monthly requests for payment to DHS using "residential service invoice" (RSI) forms. But the trial record contained *no* SFHS cost reports or RSI forms. Rau admitted that the RSI form is prepared on a per-resident basis, not a per-facility basis. No witness explained the manner and frequency in which SFHS facilities submitted payment requests to DHS in the years in question. And Hays failed to include in the record on appeal the

exhibit showing Rau's calculations. On this record, Rau's opinion as to the number of false claims was simply an unsubstantiated guess.

In addition, we have a more fundamental problem with the district court's decision to accept Rau's opinion as to the number of false claims. Bornstein instructs us to focus on "the specific conduct of the person from whom the Government seeks to collect the statutory forfeiture." 423 U.S. at 313. Here, the misconduct was to purchase approximately $6,000 worth of apples, give them to employees during the holiday season, and then falsely claim Medicaid reimbursement for this expense. Medicaid reimbursement is a rate-based regime. A facility's historical costs are recorded on an annual cost report. DHS then uses that report to calculate a payment rate or rates which are applied to all covered services over the following year (disregarding necessary time lags in the complex system). See 42 U.S.C. § 1396a(a)(13)(A); MINN. RULES chs. 9549 (nursing facilities), 9553 (intermediate care facilities). Under this system, a one-time expense for a multi-facility provider may be reimbursed over hundreds or many thousands of claims for reimbursement of services provided to individual residents. Under Rau's analysis, this protracted method of government reimbursement produces a $1,000,000 penalty (200 claims times $5,000 per claim) that bears no rational relationship to the false claim misconduct -- seeking improper reimbursement for spending $6,000 to purchase apples. Thus, we reject layman Rau's approach to deciding a legal question laced with Excessive Fines Clause implications. "It is [the] conduct of the medical practitioner, not the disposition of the claims by the government, that creates FCA liability." United States v. Krizek, 111 F.3d 934, 940 (D.C. Cir. 1997) (rejecting a government number-of-claims theory that produced "an astronomical $81 million worth of [penalties] for alleged actual damages of $245,392").

There remains the question of how we should dispose of the number-of-claims issue. The district court's determination of 336 false claims obviously cannot be upheld because ten of the eleven categories of claims were beyond its jurisdiction.

-14-

As we have explained, Rau's opinion that there were two hundred false claims relating to apples is unsupportable as a matter of law. In reviewing the documentary portion of the record on appeal,[6] we noted DHS audit reports showing that employee gift apples were claimed by eight SFHS facilities and subsequently disallowed by DHS. The decision to falsely and knowingly claim those apples as a reimbursable expense for each facility was clearly eight false claims for FCA purposes. Therefore, taking into account the district court's judgment that defendants engaged in serious misconduct, we will impose the maximum $10,000 penalty per violation and reduce the total FCA penalty to $80,000.

The judgment of the district court is reversed in part, and the case is remanded with directions to enter a modified final judgment in which (i) the penalty set forth in paragraph 1 of the court's order for judgment dated August 20, 2001, is changed from $1,680,000 to $80,000, and (ii) plaintiff's claims against defendant Kay Knock are dismissed with prejudice. Appellants' motion to strike is denied as moot.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[6]The record on appeal apparently omits many trial exhibits, but any blame for that must fall on Hays, who has the burden of proof on this issue.

-15-