# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-1649

_____

Martin Schell

*Relator - Appellant*

United States of America, ex rel Martin Schell

*Plaintiff*

v.

Bluebird Media, LLC; Bluebird Network, LLC

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: January 14, 2015
Filed: May 29, 2015

_____

Before SMITH, BENTON, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Martin Schell filed a qui tam suit against Bluebird Media and Bluebird Network under the False Claims Act, 31 U.S.C. §§ 3729-3733, alleging Bluebird[1] made false statements to the government to secure a grant and retaliated against Schell, a former Bluebird employee, for reporting fraudulent or illegal conduct. The district court[2] granted summary judgment in Bluebird's favor on all of Schell's claims. Schell now appeals, challenging the court's grant of summary judgment and two earlier orders denying Schell's motion to modify the scheduling order and motion for an extension of time to respond to Bluebird's motion for summary judgment. We lack jurisdiction to address Schell's challenges to the two earlier orders because he did not indicate his intent to appeal those decisions in his notice of appeal. We affirm the district court's grant of summary judgment on all other claims.

## I. Background

In March 2010, Bluebird Media submitted an application for a three-year grant from the National Telecommunications and Information Administration ("NTIA") of the United States Department of Commerce for the purpose of increasing broadband accessibility in northern Missouri. NTIA awarded Bluebird Media the grant in July 2010. In January 2011, Bluebird Media informed NTIA of its intent to enter a joint venture with Missouri Network Alliance ("MNA"). The two companies created and co-owned a new company, Bluebird Network,[3] which NTIA approved as a sub-

---

[1]Bluebird Media and Bluebird Network are noted separately where necessary and otherwise referred to jointly as "Bluebird."

[2]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

[3]Bluebird Media owned 51% of Bluebird Network and MNA created a holding company, MNA Holdings, which owned 49% of Bluebird Network. Bluebird Network established a wholly owned subsidiary, Bluebird Media Network, which became the sub-recipient of the grant.

recipient for the grant's continued administration through the end of the grant period. Bluebird Network was managed by a Board consisting of five individuals selected by Bluebird Media and five individuals selected by MNA.

The grant required Bluebird to provide matching funds for more than $19 million in project-related costs, which could be in the form of cash or in-kind contributions from non-federal sources. In its grant application, Bluebird provided a project budget that identified a number of potential sources for the matching funds, including $10 million from Advantage Capital Partners, $9.158 million from Boone County National Bank, and a $10.5 million in-kind contribution from the State of Missouri ("the State"). Bluebird ultimately met its match requirements through the in-kind contribution and cash and financing obtained from the joint venture with MNA. The application noted the State would provide discounted rights-of-way along state properties and convey parcels of land so Bluebird could lay fiber optic cables and operate facilities, and the State would receive heavily discounted bandwidth rates in exchange. All three potential funding sources provided letters in support of Bluebird's application. The application stated the project would serve underserved areas of northern Missouri, including a number of "community anchor institutions," such as schools, libraries, and healthcare providers. The application did not name specific institutions that would be served. Bluebird's due diligence documents included a letter stating Bluebird Media would be solely responsible for the management of the proposed project. The letter also stated that GlenMartin, Inc., a company owned by two Bluebird owners, Chris and Tatum Martin, would have no role in the management of Bluebird Media and would only be associated with Bluebird Media as a potential subcontractor.

Schell began working for Bluebird Media in October 2010 and became Vice President of Operations of Bluebird Network in June 2011. Schell reported to Eric Fogle, who served as Bluebird's CEO from August 2010 to December 2011, when Fogle was terminated. Fogle instructed Schell to complete various assignments

related to the grant, including analyzing the value of the State's in-kind contribution and the cost of the services Bluebird provided to the State. During his tenure as Vice President of Operations, Schell expressed various concerns to Fogle about Bluebird's ability to meet its obligations under the grant, including the viability of the Boone funding, Chris and Tatum Martin's involvement in Bluebird's management, Bluebird's ability to quote or provide service in MNA service areas, and the validity of the State in-kind match arrangement. Schell also suggested more cost-effective means for obtaining the rights-of-way the State offered to provide. Fogle informed the Board that Schell questioned the validity of the in-kind match arrangement and suggested more cost-effective means of securing rights-of-way, and Schell stated that he believed his other concerns were known to the Board, based on his knowledge of Bluebird's communication and corporate structure. In October 2011, Bluebird terminated Schell's employment, informing him they were eliminating the position of Vice President of Operations. At Schell's request, Bluebird provided him a service letter, pursuant to Missouri Revised Statute § 290.140, that stated Schell was terminated because his position was eliminated.

Schell filed a qui tam complaint under seal in January 2012. The government declined to intervene, and Schell's complaint was unsealed and served on Bluebird in February 2013. Schell raised three claims against Bluebird: (1) fraud against the United States, pursuant to 31 U.S.C. § 3729; (2) retaliation, pursuant to 31 U.S.C. § 3730(b); and (3) violation of the Missouri service letter statute, Mo. Rev. Stat. § 290.140. In Count 1, relevant to this appeal, Schell alleged Bluebird knowingly made false statements to NTIA in its grant application by: (1) asserting Boone could provide certain matching funds, even though Bluebird and Boone knew Boone did not intend to provide this funding; (2) falsely classifying the exchange with the State as an "in-kind contribution" when Bluebird actually exchanged rate discounts for the rights-of-way and parcels of land it received; (3) promising Chris and Tatum Martin would not manage Bluebird's participation in the grant, when in fact they did manage Bluebird's participation and used it to engage in self-dealing with GlenMartin; and

-4-

(4) knowingly allowing the purpose of the grant network to be redirected from providing service to specified community anchor institutions to providing connection and backhaul services to wireless communication towers and cellular companies once MNA took effective control of the grant project.[4]  In Count 2, Schell alleged he was terminated as a result of his complaints to Fogle about Bluebird's fraudulent and illegal behavior.  In Count 3, Schell alleged Bluebird gave a false reason for his termination in the service letter they provided, stating his position was eliminated when in fact he was terminated in retaliation for his complaints.

The district court granted Bluebird's motion for summary judgment on all counts.  On Count 1, the court found Schell failed to present submissible evidence showing Bluebird made false statements to NTIA in its grant application.  On Count 2, the court found Schell did not put forward evidence showing that he engaged in protected activity or that Bluebird's board knew about his complaints when they terminated him.  On Count 3, the court found no reasonable juror could conclude the service letter Bluebird provided was false.  Schell now appeals, arguing genuine issues of material fact precluded the district court from granting summary judgment.

---

[4]Schell also claimed that Bluebird knowingly made a false statement in telling NTIA that the area they intended to serve was underserved in terms of broadband access even though they knew it was not, an argument the district court rejected. Schell has not meaningfully briefed a challenge to the court's ruling on this point and thus has waived it on appeal.  See Rotskoff v. Cooley, 438 F.3d 852, 854 (8th Cir. 2006) (appellant's failure to develop an issue in his brief, as required by rules of appellate procedure, constitutes abandonment of the issue on appeal).

## II. Discussion

### A. Motions to Modify and for an Extension

In his brief, Schell argued the district court erred in denying two motions he filed, a motion to modify the scheduling order and a motion for an extension of time to respond to Bluebird's motion for summary judgment. We lack jurisdiction to consider these arguments. Schell's notice of appeal indicated he was appealing from the district court's final order, its grant of summary judgment, and did not indicate his intent to appeal earlier orders. Federal Rule of Appellate Procedure 3 requires that the notice of appeal specify, among other things, "the judgment, order, or part thereof being appealed." Fed. R. App. P. 3(c)(1)(B). "Although we traditionally construe notices of appeal liberally . . . an intent to appeal the judgment in question must be apparent and there must be no prejudice to the adverse party." Berdella v. Delo, 972 F.2d 204, 207 (8th Cir. 1992). If an appellant fails to provide proper notice of his intent to appeal an order or judgment, we lack jurisdiction to review it. Trustees of Electricians' Salary Deferral Plan v. Wright, 688 F.3d 922, 925 n.2 (8th Cir. 2012).

In this case, Schell's intent to appeal the district court's earlier orders was not apparent. Schell points to a statement of issues he filed after the time period for appeal had passed, which indicated his intent to appeal the denial of the motion to modify the scheduling order, and asks us to treat it as an appeal information form for the purposes of curing his deficient notice of appeal. See Hallquist v. United Home Loans, Inc., 715 F.3d 1040, 1045 (8th Cir. 2013) ("'[E]ven when the notice of appeal is deficient, jurisdiction may be established by a properly filed appeal information form . . . which indicates the appellant's intent to appeal a particular order.'" (quoting USCOC of Greater Mo. v. City of Ferguson, Mo., 583 F.3d 1035, 1040 (8th Cir. 2009))). Even if we were to do so, it would not help Schell in this case, as he filed his statement of issues after the time period for appeal had elapsed. See Wright, 688 F.3d at 925 n.2 ("In order for Form A [the appeal information form] to be considered

part of the notice of appeal, it must be filed within the time constraints for the notice of appeal.").  As Schell did not give proper notice of his intent to appeal these orders, we lack jurisdiction to review them.

## B.  False Claims

We review the district court's grant of summary judgment de novo, evaluating "whether the record, viewed in a light most favorable to the non-moving party, shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Rabushka ex rel. United States v. Crane Co., 122 F.3d 559, 562 (8th Cir. 1997); see also Fed. R. Civ. P. 56(a).

The False Claims Act (FCA) imposes liability on those who knowingly make false or fraudulent claims that cause the government to pay money.  See In re Baycol Prods. Litig., 732 F.3d 869, 874 (8th Cir. 2013).  It applies to a person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," among other actions. 31 U.S.C. § 3729(a)(1)(A)-(B).  "Summary judgment is appropriate if the plaintiff lacks sufficient evidence to show that any false or fraudulent claims have been made."  Rabushka, 122 F.3d at 563.

Schell argues that Bluebird made false statements in their grant application that were material to NTIA's decision to award Bluebird the grant.  In identifying Bluebird's alleged false claims, Schell argues that "[t]wo different analyses potentially apply to these facts" because "the grant was implemented in a manner that, in several regards, was substantially different from the grant application that had been previously submitted to, and approved by, the NTIA." Schell's proposed analyses are that: (1) the grant application itself was a false claim because it contained false statements, or (2) Bluebird fraudulently induced NTIA to award the grant by making

-7-

false statements in their grant application, thus making all subsequent requests for payment actionable false claims. Bluebird argues that Schell has waived the fraudulent inducement theory because he raised it for the first time on appeal and that, regardless of which analysis is applied, Schell's claim fails because he has not shown Bluebird knowingly made any false statements in its initial grant application. We agree that, viewing the evidence in Schell's favor, he has failed to present evidence that raises a genuine issue as to whether Bluebird made false statements in their grant application, and thus his claim fails under either analysis.

The district court thoroughly discussed each of the statements Schell claimed were false, and we add only brief comments to that discussion. Schell appeals the district court's findings on Bluebird's statements in five areas. First, Schell alleges that Bluebird promised to serve community anchor institutions throughout northern Missouri and violated that promise by redlining areas where MNA was already present, i.e., choosing not to compete or provide service in those areas. Second, Schell alleges that Bluebird identified Boone as the source of $9.158 million in funding but knew all along that Boone was not a viable funding source. Third, Schell alleges Bluebird misrepresented the nature of the contribution it received from the State, arguing that a contribution should not be considered "in-kind" if it involves reciprocal exchange of services and that the valuation of the agreement was flawed. Fourth, Schell alleged that Bluebird promised to maintain control of the grant throughout its implementation but broke that promise by merging with MNA and effectively ceding control and management of the grant by giving MNA 5 of the 10 Bluebird Network board positions. Finally, Schell claims Bluebird broke its promise that Chris and Tatum Martin and their company, GlenMartin, would not be involved in the management and implementation of the grant by allowing them to be heavily involved in the operations of Bluebird Media.[5]

---

[5]The promise in question, stemming from a letter signed by Bluebird Media's managing member, stated that GlenMartin would have no role in the management of

The evidence presented shows Bluebird made some changes as it executed the grant. Mere evidence of these changes, without more, does not prove Bluebird's initial statements were false. The grant application did not contain a specific list of community anchor institutions that would be served, and after the grant was awarded, Bluebird communicated with and received approval from NTIA on the route and specific institutions it would serve. Bluebird's grant application identified proposed funding options it was negotiating, and NTIA approved the full financing Bluebird eventually secured. The grant application made clear that Bluebird intended to offer the State discounted bandwidth rates in exchange for its in-kind contribution, and once Bluebird finalized negotiations with the State, NTIA approved the contribution. Schell provides no authority suggesting the exchange of services invalidated the in-kind contribution, which necessarily means he fails to provide authority suggesting that Bluebird knew or should have known the contribution was invalid because it involved exchange of services. Bluebird Media informed NTIA of its intent to join with MNA, and NTIA approved that change and continued to administer the grant with Bluebird Network. Schell provides no authority for the proposition that Bluebird Media ceded control of the grant when it proceeded with a joint venture, the terms of which NTIA knew and approved. And even if he had, he presents no evidence suggesting Bluebird intended to pursue that course when it submitted the grant application. Schell's claim that Bluebird misrepresented GlenMartin's management of the project fails for the same reason: not only does he fail to offer sufficient evidence showing Bluebird actually violated its promise, but he also offers no evidence that Bluebird intended to do something other than what it promised in the grant application.[6]

Bluebird Media. The letter did not mention Chris and Tatum Martin, whose involvement in the project was evident throughout the grant application.

[6]Schell also appeals two evidentiary decisions the district court made, arguing the court failed to consider evidence that would have supported his claims. First, he challenges the district court's decision that a statement by Eric Fogle—claiming that

Schell does not show that Bluebird knew these changes would be necessary and obscured the true information or otherwise presented their grant application with the mens rea the FCA requires.[7] Cf. United States ex rel. Costner v. United States, 317 F.3d 883, 888 (8th Cir. 2003) ("A contractor that is open with the government regarding problems and limitations and engages in a cooperative effort with the government to find a solution lacks the intent required by the Act."); United States ex rel. Lamers v. City of Green Bay, 168 F.3d 1013, 1018 (7th Cir. 1999) (where a relator claims the presentment made to the government was a defendant's false promise of future compliance, the relator must show the promise was false when made, meaning the defendant did not intend to comply). The district court properly granted summary judgment on Schell's claim because he failed to present evidence of a false claim within the meaning of the FCA.

_____

another Bluebird executive, Chris Bach, told him well after the grant application was submitted that Boone was not a legitimate source of funds—was inadmissible hearsay. Schell argues the statement was admissible as an opposing party statement, but we find the point irrelevant. Bach's statement says nothing about Bluebird's understanding of the viability of the Boone funding when they submitted the grant application. Schell also claims the court erred in refusing to consider Fogle's testimony that GlenMartin bought and managed domain rights affiliated with Bluebird Media's email system. While the court did note that Fogle failed to show personal knowledge of this information, it still analyzed the testimony and concluded Schell's evidence was insufficient. Thus we do not find the court refused to consider this testimony and need not address Schell's argument against exclusion.

[7]Schell argues NTIA's knowledge does not constitute a defense to Bluebird's false statements because the false statements were made before the government had knowledge of the true information. See United States ex rel. Costner v. United States, 317 F.3d 883, 887 (8th Cir. 2003) ("'[I]f the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim.'" (alteration in original) (quoting United States ex rel. Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 (4th Cir. 2002))). This point is irrelevant as Schell cannot prove Bluebird made any false statements it needed to correct.

## C. FCA Retaliation

Schell filed an FCA retaliation claim pursuant to 31 U.S.C. § 3730(h), alleging Bluebird terminated him for engaging in protected conduct. Bluebird contests that Schell engaged in any protected activity and argues that, even if he had, he failed to present any evidence that the decision makers who terminated him—Bluebird's board—knew he engaged in protected activity.

"The FCA whistleblower statute protects employees who are 'discharged . . . because of lawful acts done by the employee . . . in furtherance of [a civil action for false claims].'" Schuhardt v. Washington Univ., 390 F.3d 563, 566 (8th Cir. 2004) (alterations in original) (quoting 31 U.S.C. § 3730(h)). To prove retaliation under the FCA, "a plaintiff must prove that (1) the plaintiff was engaged in conduct protected by the FCA; (2) the plaintiff's employer knew that the plaintiff engaged in the protected activity; (3) the employer retaliated against the plaintiff; and (4) the retaliation was motivated solely by the plaintiff's protected activity." Id. To constitute protected activity, an employee's conduct must satisfy two conditions: (1) it "must have been in furtherance of an FCA action" and (2) it "must be aimed at matters which are calculated, or reasonably could lead, to a viable FCA action," meaning "'the employee in good faith believes, and . . . a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government.'" Id. at 567 (quoting Wilkins v. St. Louis Hous. Auth., 314 F.3d 927, 933 (8th Cir. 2002)).

Eric Fogle, who served as Schell's supervisor and the CEO of Bluebird during Schell's tenure there, claimed that Bluebird's board instructed him to terminate Schell but initially did not give a reason for the termination. Fogle warned the Board that terminating a vice president without a reason could expose the company to legal liability, so the Board asked him to "hold off" on any termination action. Approximately two weeks later, the Board instructed Fogle to terminate Schell and

inform him that his position had been eliminated. Fogle claimed the Board did not discuss potential cost savings from Schell's termination, but he also said he was not included in conversations about the termination, and he did not indicate Schell was terminated in retaliation for his complaints. Schell alleges he was terminated because he voiced concerns about Bluebird's conduct in administering the grant. Fogle told the Board that Schell questioned the validity of the State's in-kind contribution and had suggested a more cost-effective means of obtaining the rights-of-way. Schell spoke to Fogle about his other complaints but does not provide any evidence indicating these complaints were shared with the Board, stating only that "[u]pon knowledge and belief about the communication and corporate structure of BN [Bluebird Network], my concerns were known to BN's Board."

We note first that, even if Schell's complaints constituted protected activity, his assumption that Fogle shared the bulk of his concerns with the Board is insufficient evidence of the Board's knowledge at the summary judgment stage. See Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1367 (8th Cir. 1983) ("Under Rule 56(e), an affidavit filed in support of or opposition to a summary judgment motion must be based upon the personal knowledge of the affiant; information and belief is insufficient."). Schell only provided submissible evidence of the Board's knowledge of his complaints about the State's in-kind contribution. Schell claims he questioned the validity of the exchange of bandwidth discounts for rights-of-way, offered a more cost-effective means of obtaining the rights-of-way, and complained that the State was not honoring its agreement to provide a full $10.5 million dollar contribution. Schell's job was to analyze the value of the in-kind contribution and Bluebird's reciprocal services. His complaints are evidence he was doing his job, but they do not show Schell believed or had reason to believe Bluebird had made a false or fraudulent claim to NTIA, nor do they show he alerted Bluebird to fraudulent or illegal activity. Compare Green v. City of St. Louis, Mo., 507 F.3d 662, 667-68 (8th Cir. 2007) (affirming summary judgment on plaintiff's FCA retaliation claim where he complained about the advisability of internal policies,

-12-

claiming they created a high probability of flawed reports and an inferior work product, but did not have reason to believe his employer was making false or fraudulent claims), with Schuhardt, 390 F.3d at 567 (reversing summary judgment on plaintiff's FCA retaliation claim where plaintiff complained to her supervisor that billing practices were illegal and fraudulent and took actions outside of her regular job duties to investigate and expose the fraud). The district court properly granted summary judgment on Schell's retaliation claim because Schell has failed to offer sufficient evidence from which a reasonable jury could find any of the elements required for a finding of FCA retaliation.

## D. Missouri Service Letter Statute

Finally, Schell claims the district court erred in granting summary judgment on his Missouri service letter claim.[8] Schell argues Bluebird violated the Missouri service letter statute, Missouri Revised Statute § 290.140, by issuing him a service letter that stated a false reason for his termination. The statute requires employers, in certain circumstances, to provide a letter on the employee's request "setting forth the nature and character of service rendered by such employee to such corporation and the duration thereof, and truly stating for what cause, if any, such employee was discharged or voluntarily quit such service." Mo. Rev. Stat. § 290.140.1.

As Schell conceded that Bluebird provided a letter and that he never provided that letter to prospective employers, he could only recover nominal damages, and only if he presented sufficient evidence to show that the service letter did not state the true

---

[8]Bluebird argues Schell waived this claim by failing to address it in his opposition to their motion for summary judgment. Schell did fail to address the claim in the argument section of his opposition, but he referenced it in his response to Bluebird's statement of uncontroverted material facts, and the district court analyzed it and granted summary judgment. We do not need to decide if the claim was waived as it clearly fails on the merits.

reason he was terminated.  See Callantine v. Staff Builders, Inc., 271 F.3d 1124, 1132 (8th Cir. 2001) (nominal damages are available even without proof of actual damages, and punitive damages are only available if the employee shows the employer acted with malice in failing to respond to a service letter request); Herberholt v. dePaul Cmty. Health Ctr., 625 S.W.2d 617, 621-24 (Mo. banc 1981) (while actual damages require a showing that plaintiff lost an employment opportunity because of an improper service letter, nominal damages are available if plaintiff shows his service letter did not state the true reason for his discharge).  Schell's service letter stated he was terminated because his position was eliminated.  Schell asserts he was terminated in retaliation for his protected activity, relying on the same evidence that was insufficient to prove his FCA retaliation claim.  He relies primarily on Fogle's account, but Fogle never stated Schell's termination was in any way related to his complaints; rather Fogle testified the Board initially instructed him to terminate Schell without cause and then later instructed him to do so because the position was being eliminated.  And while Schell contends that his position was essential to the success of the company, the evidence shows Bluebird has never reinstated the Vice President of Operations' position after Schell's termination.  As Schell has failed to raise any genuine issue as to whether his service letter stated a false reason for his termination, we affirm the district court's grant of summary judgment on this claim.

## III.  Conclusion

We lack jurisdiction to address Schell's challenges to the district court's orders denying his motion to modify the scheduling order and motion for an extension of time to respond to Bluebird's motion for summary judgment.  We affirm the district court's grant of summary judgment on all other claims.

_____

-14-